## JONES et al. v. UNITED STATES.*

### (Circuit Court of Appeals, Ninth Circuit. May 4, 1908.)

### No. 1,497.

**1. COURTS—FEDERAL COURTS—CRIMINAL PROCEEDINGS—STATE PRACTICE.**

Criminal cases in the federal courts are governed by federal statutes and decisions; state statutes and decisions being inapplicable.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 908.

State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

**2. CRIMINAL LAW—LIST OF WITNESSES OR JURORS.**

If a federal prisoner is not indicted for a capital offense, he is not entitled as of right to a list of witnesses or jurors.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 1420–1436.]

**3. GRAND JURY—DISCHARGE.**

A grand jury can be discharged only by direct order of the court or by the final adjournment of the court for the term for which the jury is impaneled.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Grand Jury, § 28.]

**4. SAME—MEETINGS.**

In the absence of an order of court, the grand jury may meet and adjourn on its own motion, and may lawfully proceed in the performance of its duties while in existence, whether the court is in session or not.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Grand Jury, § 69.]

**5. SAME—IMPROPER DISCHARGE OF JUROR.**

The improper discharge of a grand juror will not vitiate an indictment, if the number necessary to find the indictment remain.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Grand Jury, § 28.]

**6. SAME—ABSENCE.**

The absence of one or more federal grand jurors, by reason of a failure to notify them of a meeting at which an indictment was found, was not sufficient to invalidate the indictment; there being present a sufficient number to find the indictment.

**7. INDICTMENT AND INFORMATION—DEFECTS—OBJECTIONS.**

While vital defects in an indictment are always available to accused, objections not affecting the real merits of the case will be overruled, under Rev. St. § 1025 (U. S. Comp. St. 1901, p. 720), providing that no indictment found or presented by a grand jury shall be deemed insufficient by reason of a defect or imperfection in form only, which shall not tend to prejudice accused.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, §§ 202–214.]

**8. CONSPIRACY—FRAUD AGAINST UNITED STATES—HOMESTEAD ENTRY.**

To obtain land of the government open to entry under its homestead laws by means of false proof in respect to the entryman's residence or improvements thereon, or for the use or benefit of another, is not only a fraud in fact, but a fraud on the homestead law, a conspiracy to commit which constituted a violation of Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), making it a crime for two or more persons to conspire to defraud the United States "in any manner or for any purpose."

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 60.]

**9. SAME—INDICTMENT.**

An indictment charged that defendants, with others, conspired to obtain from the government certain specified tracts of land open to homestead entry by procuring certain named persons to enter the same by

---

*Rehearing denied June 10, 1908.

means of false proof in respect to their residence on and improvement of the land, and with respect to the intent with which and the purpose for which the entries were made, and in pursuance of such conspiracy and to effect the object thereof defendants caused and procured C. to make the homestead proof in respect to the land entered by him and the final affidavit required by homestead claimants, including a statement that his family consisted of himself and wife, and that they had resided continuously on the land since first establishing residence thereon, which proof was subscribed by C. and certified by defendant W., and that each of the defendants knew that the proof was false, etc. *Held*, that the indictment was sufficient.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 79–99.]

**10. SAME—OVERT ACTS.**

While no overt act was required to constitute a conspiracy at common law, a conspiracy to defraud the United States, denounced by Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), is not effected until an overt act is committed by one or more of the conspirators.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 38, 39.]

**11. CRIMINAL LAW—LIMITATIONS.**

Where an alleged conspiracy to defraud the United States, denounced by Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), contemplated various overt acts and the consequent continuance of the conspiracy beyond the commission of the first one, each overt act gave a new, separate, and distinct effect to the conspiracy, and constituted another crime, so that a prosecution was not barred by limitations until three years after the commission of the last overt act alleged.

[Ed. Note.—Commencement of period of limitations against prosecutions for continuing offenses, see note to Ware v. United States, 84 C. C. A. 519.]

**12. SAME—EVIDENCE—OTHER OFFENSES.**

Where an indictment for conspiracy to defraud the United States of government land ·by fraudulent homestead entries charged defendants with conspiring to defraud the government of lands embraced in certain homestead claims filed by certain named persons, the government was properly permitted, for the purpose of proving defendants' intent and guilty knowledge, to show that various other persons had also filed on and made final proof on various other tracts of land under the homestead laws, in pursuance of an agreement with the defendants and for their benefit.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 825–834.]

**13. WITNESSES — CROSS-EXAMINATION—DOCUMENTS—INTRODUCTION IN WHOLE OR IN PART.**

Where, on cross-examination, a witness admitted making a sworn statement, the witness was not subject to examination as to whether such statements as counsel might suggest were contained in it had been made by the witness, for the purpose of contradicting him; but the entire statement was admissible.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 50, Witnesses, §§ 1249–1251.]

In Error to the Circuit Court of the United States for the District of Oregon.

S. B. Huston and Martin L. Pipes, for plaintiffs in error.

William C. Bristol, U. S. Atty.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. The plaintiffs in error were defendants in the court below to an indictment based upon the provisions of section 5440 of the Revised Statutes (U. S. Comp. St. 1901, p. 3676), which reads as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than one thousand dollars and not more than ten thousand dollars, and to imprisonment not more than two years."

We may as well, also, insert here some other sections of the same statutes which are pertinent to the case as presented. They are:

"Sec. 808. Every grand jury impaneled before any District or Circuit Court shall consist of not less than sixteen nor more than twenty-three persons. If of the persons summoned less than sixteen attend, they shall be placed upon the grand jury and the court shall order the marshal to summon either immediately or for a day fixed, from the body of the district, and not from the bystanders, a sufficient number of persons to complete the grand jury. And whenever a challenge to a grand juror is allowed, and there are not in attendance other jurors sufficient to complete the grand jury, the court shall make a like order to the marshal to summon a sufficient number of persons for that purpose." U. S. Comp. St. 1901, p. 626.

"Sec. 811. The Circuit and District Courts, the district courts of the Territories, and the Supreme Court of the District of Columbia may discharge their grand juries whenever they deem a continuance of the sessions of such juries unnecessary." U. S. Comp. St. 1901, p. 627.

"Sec. 1021. No indictment shall be found nor shall any presentment be made, without the concurrence of at least twelve grand jurors." U. S. Comp. St. 1901, p. 719.

In the court below the plaintiffs in error made a motion to quash the indictment against them on the ground that the names of the witnesses summoned before the grand jury were not inserted at the foot of the indictment or indorsed thereon. By a statute of the state of Oregon, where the case arose, it is provided that the indictment must be set aside when "the names of the witnesses summoned before the grand jury are not inserted at the foot of the indictment, or indorsed thereon" (section 1349, B. & C. Comp. Oregon), which provision of the state statute the Supreme Court of Oregon has held to be mandatory. State v. Pool, 20 Or. 150, 25 Pac. 375; Owens v. Snell, Heitshu & Woodard Co., 29 Or. 483, 44 Pac. 827; State v. Andrews, 35 Or. 388, 58 Pac. 765; State v. Warren, 41 Or. 348, 69 Pac. 679.

It is insisted on the part of counsel for the plaintiffs in error that the state statute and state practice of Oregon controls the federal court in that respect. In that counsel are altogether mistaken. Criminal cases in the federal courts are governed and controlled by federal statutes and federal decisions, and state statutes and state decisions are inapplicable. United States v. Reid, 12 How. 363, 13 L. Ed. 1023; Starr v. United States, 153 U. S. 625, 14 Sup. Ct. 919, 38 L. Ed. 841; Jones v. United States, 137 U. S. 211, 11 Sup. Ct. 80, 34 L. Ed. 691; Simmons v. United States, 142 U. S. 148, 12 Sup. Ct. 171, 35 L. Ed. 968; Logan v. United States, 144 U. S. 301, 12 Sup. Ct. 617, 36 L. Ed. 429; Lang v. United States, 133 Fed. 201, 66 C. C. A. 255; United States v. Davis (C. C.) 103 Fed. 457; United States v.

Hall (D. C.) 53 Fed. 353; United States v. Stone (C. C.) 8 Fed. 239.

In the case of Shelp v. United States, 81 Fed. 694, 26 C. C. A. 570, which arose in Alaska, we said:

"The statute of the United States provides that, when a party is indicted for treason, a copy of the indictment and a list of the jury and of the witnesses to be produced at the trial, stating the place of abode of each juror and witness, shall be furnished to such persons three days before the trial. Rev. St. § 1033 (U. S. Comp. St. 1901, p. 722). This statute has no application to this case. There is no statute which requires a list of the witnesses to be furnished to a person indicted for a misdemeanor. If the indictment is not for a capital offense, the defendant is not entitled, as a matter of right, to a list of witnesses or jurors. U. S. v. Wood, 3 Wash. C. C. 440, Fed. Cas. No. 16,756; U. S. v. Williams, 1 Cranch, C. C. 178, Fed. Cas. No. 16,709; U. S. v. Van Duzee, 140 U. S. 169, 173, 11 Sup. Ct. 758, 35 L. Ed. 399, and authorities there cited."

In Ball v. United States, 147 Fed. 32, 78 C. C. A. 126, this court also said:

"It is assigned as error that the court overruled the motion of the plaintiff in error to require the district attorney to furnish him a list of all the witnesses to be produced against him on the trial, in accordance with the provisions of section 1033 of the Revised Statutes (U. S. Comp. St. 1901, p. 722). That statute applies only to the trial of treason and capital cases in the courts of the United States. The present case was tried in a territorial court under the Penal Code and Code of Criminal Procedure. Those Codes contain no requirement that a list of witnesses be furnished the accused upon demand or otherwise. In Thiede v. Utah Territory, 159 U. S. 510, 515, 16 Sup. Ct. 62, 40 L. Ed. 237, it was held that section 1033 does not control practice and procedure in territorial courts. The court said: 'In the absence of some statutory provision, there is no irregularity in calling a witness whose name does not appear on the back of the indictment or has not been furnished to the defendant before the trial.'"

In Balliet v. United States, 129 Fed. 689, 64 C. C. A. 201, the Circuit Court of Appeals for the Eighth Circuit, in passing upon a similar question, said:

"Except when a person is indicted for treason or some capital offense (vide section 1033, Rev. St. U. S.), there is no provision found in the federal statutes requiring the accused in a criminal action to be furnished with a list of the witnesses who will be produced against him, or requiring the names of witnesses to be indorsed on the indictment; and the fact that a special provision is made for advising the accused of the names of witnesses who will be produced on trials for treason and other capital offenses warrants the inference that in prosecutions for other offenses against the laws of the United States it is unnecessary to advise the accused of the names of witnesses who will be sworn. The maxim, 'Expressio unius est exclusio alterius,' clearly applies. By virtue of section 1033, supra, a person indicted for treason or a capital offense is entitled to be furnished with a list of witnesses to be produced, three days before the trial on an indictment for treason and two days before the trial in other capital cases, and, if the accused seasonably claims this right, it is error to put him on trial and permit witnesses to testify against him without furnishing him with a list. Logan v. United States, 144 U. S. 263, 304, 12 Sup. Ct. 617, 36 L. Ed. 429. But in the absence of some statute prescribing a contrary rule there is neither error nor irregularity in permitting a witness for the government to be sworn, in criminal cases other than those above mentioned, whose name does not appear on the back of the indictment or has not been furnished to the accused."

The plaintiffs in error also filed a plea in abatement, which plea was based upon this agreed statement of facts:

"The grand jury which indicted the defendants was composed of 20 members. They were all present during the taking of the testimony against the defendants, except one, F. W. Durbin, on Friday, September 1, 1905. They all voted in favor of the indictment against the defendant Potter, and all but one as against the defendant Jones, but did not return their indictment into court at that time. They thereupon adjourned until Tuesday, the 5th day of September, 1905. After they had adjourned, the United States attorney and the foreman caused a notice to be sent to them, by mail, telegraph, and telephone messages, through the United States marshal and his deputies, to meet again on Saturday, the 2d day of September, 1905. Eighteen of them met on the 2d, the said F. W. Durbin not being present; and another, Jackson A. Bilyeu, was not present because he was not notified. Durbin had been excused for an indefinite period by the foreman and the United States Attorney, on the 26th of August, and did not meet with the grand jury until the 28th of September. On the 2d of September, when 18 of them met, they found this indictment, and it was indorsed and returned into court by the foreman in the presence of the other seventeen."

It is not pretended that the court had adjourned for the term, nor does the plea negative the fact that 12 jurors agreed in finding the indictment. The contention is that the grand jury was not in legal session, because on the 1st of September it had adjourned to the 5th, and had no authority to reconvene on the 2d. We do not think there is any merit in the point. A grand jury can be discharged only by direct order of the court, or by the final adjournment of the court for the term for which the jury is impaneled. In the absence of an order of the court, certainly, the jury may meet and adjourn upon its own motion, and may lawfully proceed in the performance of its duties while in existence, whether the court be in session or not. Nealon v. People, 39 Ill. App. 481; In re Gannon, 69 Cal. 541, 11 Pac. 240; State v Reid, 20 Iowa, 413; Ulmer v. State, 14 Ind. 52.

It has been many times decided that the improper discharge of a juror will not vitiate an indictment, provided that the number necessary to find it remain. U. S. v. Belvin (C. C.) 46 Fed. 381; Gladden v. State, 12 Fla. 623; Smith v. State, 19 Tex. App. 95; Portis v. State, 23 Miss. 578; State v. Wilson, 85 Mo. 134; Commonwealth v. Burton, 4 Leigh (Va.) 645, 26 Am. Dec. 337. Manifestly, therefore, the absence of one or more of the jurors, by reason of a failure to notify them of the meeting, could not work that result, provided there were present a sufficient number to find the indictment. The statutes of the Unites States, as has been seen, require a grand jury to "consist of not less than sixteen nor more than twenty-three persons," and make the concurrence of 12 of their number necessary to the finding of an indictment; but there is nothing in them to indicate any consequence to the absence of 1 or more of the jurors, provided the indictment be concurred in by 12. Said the Supreme Court of California in People v. Hunter, 54 Cal. 65, 66:

"The common law required that 24 should be summoned to attend on the grand jury; but not more than 23 were sworn, because of the inconvenience which might arise in case 12, who were sufficient to find a true bill, were opposed by other 12, who should be against a finding. Whatever number were sworn, those sworn constituted the grand jury; and it was never claimed that the death or discharge by the court of any of those sworn, provided 12 remained, rendered the action of a grand jury illegal. In 1856, the California statute read: 'If, of the persons summoned, not less than seventeen, nor more than twenty-three, attend, they shall constitute the grand jury.' St. 1852, p. 108, c.

47, § 9. Yet in that year the Supreme Court (People v. Roberts, 6 Cal. 214) held that all of the 17 need not have been present at the finding of an indictment, if 12 concurred in the finding. Among other reasons given in the opinion in support of the conclusion to which the court arrived is one drawn from the manifest inconvenience which would arise in every case, when, after the impaneling of the jury, one of the number was temporarily absent, from indisposition or otherwise; and it is added: 'In construing statutes, it is proper that some intelligence and foresight should be accorded to the Legislature, and it is the duty of the court to give such a construction as will best carry their design into effect, unless overruled by some authoritative or controlling principle of law.' If the argument ab inconvenienti can be resorted to at all, it must be admitted that it could hardly have been the intent of the Legislature that the event of the death of any of those constituting a grand jury should render invalid all that had been done by the jury previous or subsequent to that event. And, as was said by this court in People v. Butler, 8 Cal. 440, 'if 12 concur in finding an indictment, it is not perceived how a prisoner can be injured by the absence of the others who were impaneled.' In People v. Gatewood, 20 Cal. 147, hereinbefore referred to, it was decided that an indictment could be legally found by 13 members of a grand jury composed of 16 persons; 3 of the number having been challenged by the defendant and excused by the court. In that case the grand jury had been impaneled under the act of 1861 (St. 1861, p. 575, c. 505), the fifth section of which reads as follows: 'If, of the persons drawn and summoned to form a grand jury * * * there shall remain 16, and no more, they shall constitute the grand jury. If, of those summoned, * * * there shall remain less than 16, those so remaining shall be placed upon the grand jury, and the court may order the sheriff to summon from the body of the county a sufficient number of persons to complete the grand jury.' The counsel for the defense in People v. Gatewood attempted to suggest the same difference between the language of the statute of 1861 and those which had preceded it which is now claimed to exist between the language of the amended provisions of the Code and that of the sections in operation immediately before the amendments to the Code. Counsel said: 'A fair construction of the statute is, that the number of persons necessary to constitute a grand jury should be present and participate in the deliberations when an indictment is found, and more especially under the recent statute declaring that a grand jury shall be composed of 16 persons.' Yet, although the precise point was made, this court determined that no result followed the absence of 1 or more of the jurors when an indictment was found, provided 12 were present, whether the number of persons to constitute the grand jury was definitely fixed by the statute, or was by the statute left to be fixed by the court."

See, also, In re Wilson, 140 U. S. 581, 11 Sup. Ct. 870, 35 L. Ed. 513; State v. Copp, 34 Kan. 532, 9 Pac. 233; Watts v. State, 22 Tex. App. 572, 3 S. W. 769; State v. Ostrander, 18 Iowa, 435; State v. Davis, 24 N. C. 157.

To the indictment objection was taken by demurrer. By section 1025 of the Revised Statutes (U. S. Comp. St. 1901, p. 720) it is declared that:

"No indictment found and presented by a grand jury in any District or Circuit or other court of the United States shall be deemed insufficient, nor shall the trial, judgment or other proceeding therein be affected, by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

Especially after verdict should this rule be adhered to. Connors v. United States, 158 U. S. 408, 411, 15 Sup. Ct. 951, 39 L. Ed. 1033; Price v. United States, 165 U. S. 311, 315, 17 Sup. Ct. 366, 41 L. Ed. 727; Lehman v. United States, 127 Fed. 45, 46, 61 C. C. A. 577; United States v. Dimmick (D. C.) 112 Fed. 352, 354; Wright v.

United States, 108 Fed. 805, 810, 48 C. C. A. 37; United States v. Rhoades (C. C.) 30 Fed. 431, 134; United States v. Chase (C. C.) 27 Fed. 807. Vital defects in an indictment are, of course, always open to attack on behalf of the defendant thereto; but too much attention should not be given to overnice distinctions and exceptions, which do not go to the real merits of a case.

Looking at the indictment here in question, we find that it charges that the plaintiffs in error, with others, did, at a certain stated time and place within the jurisdiction of the court below, unlawfully conspire knowingly and wickedly and corruptly to defraud the United States out of the possession and use and title to certain specifically described lands, which were open to homestead entry under the land laws of the United States at the time the respective homestead filings stated in the indictment were made thereon at the local land office of the United States at Oregon City, in the state and district of Oregon, all of which said lands the indictment specifically sets out and describes, together with the names of the entrymen who made such homestead filings and the date upon which such filings by the said entrymen were made, by means of false, illegal, and fraudulent proofs of homestead entry and of settlement and improvements upon said lands, respectively, by said entrymen, respectively, and by causing and procuring said respective entrymen to make false and fraudulent proofs of settlement and improvements upon said lands, respectively, and thereby to induce the said United States to convey by patent said public lands to the said respective entrymen, without any valid or sufficient consideration therefor, said defendants, Willard N. Jones, Thaddeus S. Potter, Ira Wade, John Doe, and Richard Roe then and there well knowing that each of said respective entrymen were not entitled thereto under the laws of the United States, by reason of the fact that they and each of them had utterly failed and neglected ever actually to settle or reside upon said lands for any period or periods of time whatsoever, and faithfully and honestly to endeavor to comply with the requirements of the homestead law as to settlement and residence upon or cultivation of the said lands so filed upon,(by) each of them, and defendants Willard N. Jones, Thaddeus S. Potter, Ira Wade, John Doe, and Richard Roe then and there well knowing that each of said respective entrymen was entering said land so filed upon by him for the purpose of speculation, and not in good faith to obtain a home for himself, and that in pursuance of said conspiracy, and to effect the object thereof, said defendants Willard N. Jones and Thaddeus S. Potter did cause, induce, and procure said Daniel Clark (one of said alleged entrymen) on the 5th day of September, 1902, to make final proof before said Ira Wade, county clerk of Lincoln county, in the said state of Oregon, a person entitled by law to take said proof, at the city of Toledo, in the state and district of Oregon, and did then and there cause, induce, and procure the said Clark to make certain answers to certain questions concerning improvements claimed to have been made by him upon the lands so filed upon by him, and concerning his actual residence thereon with his family, and concerning the character of the said land, and his final affidavit, required of homestead claimants by law, all of which the indictment specifically set out, in-

cluding question numbered 5, which, with the answer thereto, is as follows:

"Of whom does your family consist; and have you and your family resided continuously on the land since first establishing residence thereon? (If unmarried, state the fact.) Ans. Myself and wife; yes"

—together with the certificate of Wade as such clerk to the signature and verification thereto of the said Clark, the said defendants W. N. Jones, Thaddeus S. Potter, and Ira Wade, and each of them, well knowing at the time said homestead proof was so subscribed and sworn to by said Daniel Clark that his answer to said question No. 5 so then and there made by said Daniel Clark was false, in this: that said Daniel Clark had never resided upon said land at all, either with or without his family, for any period or periods of time whatsoever; and that in furtherance of said conspiracy and to effect the object thereof the said Ira Wade did, on the 5th day of September, 1902, subscribe and execute a certificate to the aforesaid homestead proof of said Daniel Clark in these words and figures:

"I hereby certify that the foregoing testimony was read to the claimant before being subscribed, and was sworn to before me this 5th day of September, 1902, at my office at Toledo, in Lincoln county, Oregon.
                                             "Ira Wade, County Clerk."

The indictment also contained similar allegations respecting the alleged entryman Addison Longenecker, and then alleged that in furtherance of said conspiracy and to effect the object thereof the said defendant Willard N. Jones did, on the 5th day of May, 1904, cause and procure certain letters and affidavits, set out at large in the indictment, to be sent to the Honorable E. A. Hitchcock, Secretary of the Interior, by C. W. Fulton, who was then and there a duly qualified and acting senator of the United States for the state of Oregon, which letters consisted of one from Senator Fulton to Secretary Hitchcock, of date May 5, 1904, inclosing a copy of a letter of date April 23, 1904, addressed to Senator Fulton by the defendant Jones, and a copy of a certain agreement, without names, signature, or date, all relating to the lands described in the indictment alleged to have been entered by Addison Longenecker, Daniel Clark, and George F. Merrill, and to which agreement was appended this affidavit:

"County of Multnomah, State of Oregon—ss.:

"I, W. N. Jones, being first duly sworn according to law, depose and say that the foregoing is a true and correct copy of the only agreement signed by Addison Longenecker, Daniel Clark, and George F. Merrill (also one of the alleged entrymen), and that there was no other verbal or written agreement, expressed or implied, whereby their homestead claim would inure in whole or in part to me, except as is stated in the foregoing agreement.
                                             "W. N. Jones.
"Subscribed and sworn to before me this 27th day of April, 1904.
                          ."Geo. Sorenson, Notary Public for Oregon."

It is said for the plaintiffs in error that, while section 5440 of the Revised Statutes makes it a crime for two or more persons to conspire to defraud the United States out of any of its land, the consummated act is not itself made a substantive offense by any statute, from which it is argued that the criminality consists in the means employed in car-

rying out the conspiracy, which must for that reason be set out with particularity.

Section 5440 makes it a crime for two or more persons to conspire to defraud the United States, whatever the manner or purpose. "In any manner or for any purpose" is the language of the statute. To obtain land of the government open to entry under its homestead laws by means of false proof in respect to the entryman's residence or improvement thereon, or for the use or benefit of another, is not only a fraud in fact, but a fraud upon the homestead law, the design of which was to afford those entitled to its beneficent provisions a home for himself and family, and not for speculation either by himself or others. This does not admit of any sort of question. When, therefore, it is charged, as it is in the indictment under consideration, that the plaintiffs in error, with others, conspired to obtain from the government certain specified tracts of land open to entry under the homestead laws, by procuring and inducing certain named persons to enter the same by means of false proof in respect to their residence upon and improvement of the land, and in respect to the intent with which and the purpose for which the entries were made, and that in pursuance of such conspiracy and to effect the object thereof the plaintiffs in error caused and procured a certain named person, to wit, Daniel Clark, to make homestead proof in respect to the land so entered by him, and the final affidavit required of homestead claimants, including the question and answer numbered 5 above set out, which proof was subscribed by Clark and certified by the defendant Wade, and that each of the defendants at the time well knew that the said proof was false, in that Clark never at any time resided upon the land so entered by him, with similar allegations in respect to the entryman Longenecker, we do not think it can be held upon any sound principle that no offense is charged. Nothing more was needed to inform the defendants of the nature and cause of the accusation against them, and the facts were so alleged as to protect them in the event of a verdict of guilty or of acquittal against any further prosecution for the same offense. The indictment, in our opinion, was sufficient.

According to the averments of the indictment, the conspiracy was formed on the 3d day of September, 1902. The indictment was returned and filed September 3, 1905. But the evidence tended to show that the conspiracy charged was formed in the year 1900, and that a number of overt acts thereunder were committed prior to September 3, 1902. There was also evidence tending to show the commission by the defendants Jones and Potter of the alleged overt acts subsequent to the finding of the indictment. By objections to the introduction of testimony, and by request for instructions, the plaintiffs in error raised the question of the statute of limitations, which we think the most serious one in the case. The rule of the common law made it a criminal and indictable offense—

"for two or more to confederate or combine together, by concerted means, to do that which is unlawful or criminal, to the injury of the public, or portions or classes of the community, or even to the rights of an individual." Callan v. Wilson, 127 U. S. 555, 8 Sup. Ct. 1301, 32 L. Ed. 223, and cases there cited.

At common law no overt act was requisite; but the mere formation of such a conspiracy by two or more persons was criminal and indictable. The offense was then complete and ended. By the provisions of section 5440 of the Revised Statutes, however, the conspiracy there denounced is not effective until an overt act is committed by one or more of the conspirators. While the Supreme Court held, in U. S. v. Britton, 108 U. S. 199, 204, 2 Sup. Ct. 525, 27 L. Ed. 703, that the offense does not consist of both the conspiracy and the acts done to effect the object of the conspiracy, but of the conspiracy alone, it also held that:

"The provisions of the statute that there must be an act done to effect the object of the conspiracy merely affords a locus penitentiæ, so that before the act done either one or all of the parties may abandon their design and thus avoid the penalty prescribed by the statute."

See, also, Dealy v. U. S., 152 U. S. 546, 14 Sup. Ct. 680, 38 L. Ed. 545.

By some courts it has been held that inasmuch as the offense under section 5440 is the conspiracy, made effective by the commission of an overt act thereunder, the statute of limitations, which is three years, begins to run as soon as the first of such overt acts is committed, and that three years thereafter the entire offense denounced by the statute becomes barred. U. S. v. Owen (D. C.) 32 Fed. 534; U. S. v. McCord (D. C.) 72 Fed. 159; Ex parte Black (D. C.) 147 Fed. 832. If the conspiracy in question contemplated but the one overt act, that would undoubtedly be so. But we think it equally plain that where, as in the present case, the alleged conspiracy contemplated various overt acts, and the consequent continuance of the conspiracy beyond the commission of the first one, then each overt act gives a new, separate, and distinct effect to the conspiracy, and constitutes another crime. Take, for illustration, a case that arose in California many years ago, reported in 64 Cal. 293, 30 Pac. 847, under the title of People v. Collins, where a murder was committed in pursuance of a conspiracy entered into by three men named, respectively, Collins, Thorne, and Crumm, for the robbing, among other things, of stages and their passengers whenever and wherever opportunity offered. In that case it appeared that, before Collins and Thorne committed the crime for which Collins was adjudged to suffer death, Crumm withdrew from the conspiracy; that is to say, he took advantage of the "locus penitentiæ," and thus avoided the penalty to which he also would otherwise have been subject. But Collins and Thorne proceeded with the unlawful and wicked undertaking, camped in the vicinity of Nevada City, Cal., held up a stage, compelled the passengers to alight therefrom, and upon the refusal of one of them to surrender his valise, containing two bars of gold bullion, one of the robbers fired upon him with a shotgun, killing him almost instantly. Months afterwards Collins was apprehended, and was finally tried, convicted, and sentenced to death. Suppose that California had a statute requiring, as does section 5440 of the Revised Statutes, an overt act to make the conspiracy effective, and that after the holding up of that one stage and the commission of that one mur-

der the conspirators, in pursuance of the same conspiracy, had held up other stages and committed other murders; would there be any sound sense in holding that no other or further crime had been committed, on the ground that the offense had been completed and ended by the first murder, the first overt act? We do not think so, for the reason that the conspiracy was a continuing one in its nature, and, so long as the conspirators continued in pursuance of it, each overt act committed by any one of them gave to the conspiracy effect and constituted an offense at the time of the commission of the act. So, in the case at bar, the conspiracy alleged contemplated the commission of various overt acts. It was a continuing conspiracy, and so long as the conspirators continued in pursuance of it, and did not avail themselves of the locus penitentiæ that section 5440 of the Revised Statutes afforded them, every overt act committed by any party to the conspiracy gave new effect to the conspiracy and constituted another crime. Such we understand to be the decision of the Circuit Court of Appeals for the Eighth Circuit in the case of Ware v. U. S., 154 Fed. 577, at page 580, 12 L. R. A. (N. S.) 1053, where the court said, in speaking of a case similar to the present one:

"The offense denounced by section 5440 is not the mere formation, but the existence, of the conspiracy and its execution; and if, by the agreement or by the joint assent of the defendant and one or more other persons within the three years, the unlawful scheme of the conspiracy is to be prosecuted, and an overt act is subsequently done to carry it into execution, the mere fact that the same parties had conspired and had wrought to accomplish the same or a like purpose more than three years before the filing of the indictment ought not to constitute, and does not constitute, a defense to the charge of the conspiracy within the three years."

See, also, to the same effect, Bradford v. U. S., 152 Fed. 616, 617, 81 C. C. A. 606; U. S. v. Bradford (C. C.) 148 Fed. 413; U. S. v. Greene (D. C.) 146 Fed. 803; Id. (D. C.) 115 Fed. 343; Lorenz v. U. S., 24 App. D. C. 337, 384; People v. Mather, 4 Wend. (N. Y.) 259, 21 Am. Dec. 122; Am. Fire Ins. Co. v. State, 75 Miss. 24, 22 South. 99; Ochs v. People, 25 Ill. App. 379.

The indictment in the present case charged the defendants thereto with conspiring to defraud the government of lands embraced by homestead claims filed, respectively, by certain named persons, and as tending to support the alleged conspiracy the government was permitted on the trial to show that various other persons had also filed upon and made final proof of various other tracts of land under the homestead laws, in pursuance of an agreement with the defendants and for their benefit. That there was no error in admitting such testimony was decided by this court in the case of Van Gesner v. U. S., 153 Fed. 46, 82 C. C. A. 180, and by the Supreme Court in Williamson v. U. S., 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278. Such collateral matter was admitted, as the trial court distinctly instructed the jury, as tending to establish guilty intent, purpose, design, or knowledge, and could only be so considered in connection with the charge against the defendants.

In Wood v. U. S., 16 Pet. 358, 10 L. Ed. 987, Mr. Justice Story, speaking for the court, said:

"Where the intent of the party is matter in issue, it has always been deemed allowable, as well in criminal as in civil cases, to introduce evidence of other acts and doings of the party, of a kindred character, in order to illustrate or establish his intent or motive in the particular act directly in judgment. Indeed, in no other way would it be practicable in many cases to establish such intent or motive; for a single act, taken by itself, may not be decisive either way, but, when taken in connection with others of a like character and nature, the intent and motive may be demonstrated almost with a conclusive certainty."

And in the case of Holmes v. Goldsmith, 147 U. S. 150, 164, 13 Sup. Ct. 288, 292, 37 L. Ed. 118, the court, in speaking upon the same subject, said:

"As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances the more correct their judgment is likely to be. 'The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree. to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth. Stevenson v. Stewart, 11 Pa. 307.' The modern tendency, both of legislation and of the decision of courts, is to give as wide a scope as possible to the investigation of facts. Courts of error are especially unwilling to reverse cases because unimportant and possibily. irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused."

See, also, Sprinkle v. U. S., 141 Fed. 811, 73 C. C. A. 285; Olsen v. U. S., 133 Fed. 849, 67 C. C. A. 21.

Another point relied upon by the plaintiffs in error arose out of the admission in evidence, over their objections, of a sworn statement made by one John L. Wells to the special agent of the government, Mr. Neuhausen. The circumstances attending the offering of that statement by the government, and its admission in evidence, were these:

Wells was a witness for the prosecution, and testified, among other things, on direct examination, that he lived in Portland, was a member of the Grand Army of the Republic, had known the defendants Jones and Potter many years, was in the real estate and insurance business, and that in the year 1900 he had talked with Potter and Jones in relation to securing soldiers' widows to file upon lands; that his first conversation was with the defendant Potter, who, the witness testified, called at his office in Portland and stated that the defendant Jones wanted to see the witness on a proposition to get some soldiers' widows to file upon some lands in the Siletz reservation, and wanted the witness to go and see Jones, which the witness did within a few days, when Jones told the witness that soldiers' widows who had never availed themselves of the right of homestead entry before the death of their husbands were entitled to 160 acres of land; that either Jones or Potter showed the witness Copp's Land Laws, where the widows were shown to be entitled to the land without settlement, and that the defendants (saying he thought both were present) wanted to know if the witness could get a few of such widows to file on the land, which he undertook to do, and within a few days got a number who said their husbands had not availed themselves of the homestead right, and

who were told by the witness to go to the office of the defendants Pot-, ter and Jones and see them in regard to the matter; that the witness then tried to find more widows to file on land, but could not do so, and then undertook to get soldiers to do so; that the witness did not know whether it was Jones or Potter who spoke to him about the soldiers, but thought it was probably Potter who spoke to him first; that Jones and Potter furnished him with a copy of a contract; that he went to soldiers and told them about the homestead proposition, and that they were to go to Jones and Potter and enter into the contract, if they wished to, or could sign the contract before the witness and he would hand it to Jones and Potter; that he thought some of them did sign before him, but that most of them signed before Jones and Potter; that he told them that if they had served two years in the army they would only have to hold the homestead about 12 or 14 months before they could prove up, and that after the final proof was made Jones would pay them $200 for their right, over and above the money expended for the land, which was to be advanced by the defendants, and for the repayment of which advances the entryman was to give to Jones a mortgage; that these statements of the witness were in accordance with what Jones and Potter told him. The witness then gave the names of soldiers to whom he made these statements, including Longenecker, and further testified that he was to receive $5 for each of the soldiers that he procured, and that he himself made a filing; that the next thing he did was to get the parties to go to the lands, which was before the filings were made, but that they went to the land office first; that he went with the persons named to Oregon City, and that the defendant Jones paid their fare and gave them the description of the land, and that some months after they had made their filings about 20 of them went to the land upon notice from Potter, who went with them and paid the expenses of the trip, and that he thought, although not positive, that the defendant Jones also went along; that he thought that most of the men went to their claims, and within a day or two the party returned to Portland; that within about six months thereafter Jones told the witness to get as many of the men as he could to go down to the land again, and that he got six or seven of the men to go, Jones paying the expenses, on which trip the parties stayed one night; that on his return from that trip the witness made a report to Jones, showing him the expenses of the trip, and gave him the number of persons who went; that they went down again the following August, 1902, and that "Lawrence, Lamphere and wife, Everson and his wife, Morrison and his wife, Hummell, Merrill, West, Garinon, and, he thought, Clark, went down, and Jones told them when to go, and said to the witness that it was time they were going down to their claims, but the bad weather started in, and that Jones gave him enough money to pay the expenses there and back; that that trip they went to the hotel and stayed all night, and the next morning got teams and went out to the claims, stayed there two days, and then came back to Toledo; that a part of them went to Newport on Monday morning, and then they came home; that he saw Jones when he got back, or a few days afterwards, and had about the same talk as he had had heretofore, and

he told Jones he had gone down there and stayed two days and two nights out on the claims, and itemized the expenses, and that there were round-trip tickets; that on that trip they stayed around there and visited each other's claims; that they did not sleep in the cabin, but outside; that there was no furniture in the cabins, except boards nailed up for a couch like, or bunk, with some straw in them; that there was about an acre cleared off of his claim, and was partly planted in potatoes and turnips and a few little apple trees, one year old apple trees of the first or second year, that was in the second year, the most of them were growing, and that there were ten or twelve of them;" that the next time they went down was in October, when Clark, Everson, Moors, Lawrence, and Gillis were in the company; that Jones asked them to go, and paid the expenses, the money for which he thought he got from Potter; that they stayed there one night and slept in the cabins; that they went back to Portland the next day, and he reported to Jones, giving him an itemized statement of the expenses; and that he told him about the same as he had told him before—that they had gone down there and visited the claims.

In connection with the testimony of the witness Wells, the prosecution offered in evidence certain of the contracts made with the men named by the witness, in the year 1900, reading as follows:

"That whereas, the party of the first part is entitled to the benefit of Act Cong. June 8, 1872, being section 2304, Rev. St., giving homesteads to honorably discharged soldiers and sailors, and desires to avail himself of the privileges granted by taking a homestead, and the party of the second part is in the possession of information relative to the existence of public lands within the state of Oregon subject to such entry: Now, therefore, the party of the second part, in consideration of the covenants and agreements on the part of the party of the first part hereinafter stipulated to be kept and performed, hereby agrees to give to the party of the first part information which will enable him to locate and file a homestead upon 160 acres of the public lands of the United States situated within the state of Oregon, and the party of the first part hereby agrees to pay to the party of the second part as compensation for such information, and for his services to be performed in the preparation of the papers and affidavits necessary in making such filing, the sum of $185, to be paid at the time and in the manner hereinafter designated. The party of the first part further agrees to employ and does hereby employ the party of the second part to build a house upon the land to be taken up under the foregoing agreement, and agrees to pay the said party of the second part therefor the sum of $100, to be paid at the time and in the manner hereinbefore designated, and also to clear and cultivate the land to be taken up under this agreement, or so much thereof as is required and for the time required by the laws of the United States in order to perfect title thereto, and to pay the said party of the second part therefor the sum of $175, to be paid at the time and in the manner hereinafter designated. And the party of the first part agrees to comply with the laws of the United States in regard to residence upon said lands, taken as a homestead. The said party of the second part hereby accepts such employment and agrees to do and perform or to cause to be done and performed, all work and labor necessary to be done and performed upon said premises in order to comply with the laws of the United States. The party of the second part hereby agrees to advance to the party of the first part, if required, the amount of fees required at the land office in order to make and perfect such filing, and all necessary expenses of the party of the first part in connection therewith, not to exceed the sum of $60, and the party of the first part agrees to repay to the party of the second part all sums of money so advanced at the time and in the manner hereinafter designated. The party of the first [second] part further agrees that after final

proof shall have been made upon said claim he will at the option of the party of the first part, procure for the party of the first part a loan not to exceed the sum of $720, to be secured by first mortgage upon said claim, and immediately upon procurement of such loan all sums of money herein stipulated to be paid to the party of the second part by the party of the first part, together with all sums of money advanced by the party of the second part to the party of the first part under this agreement, shall become due and payable and shall be paid out of the amount so secured; and it is further understood by and between the parties hereto that the payment by the party of the first part to the party of the second part of all sums of money hereinbefore designated shall be conditioned upon the procurement by the party of the second part of the loan hereinbefore mentioned, is [if] the same shall be required. In case the party of the first part shall not wish to avail himself of the loan hereinbefore mentioned, then and in that event all moneys advanced to the party of the first part by the party of the second part under this agreement, together with all sums of money herein agreed to be paid to the party of the second part, shall become due and payable as soon as final proof shall have been made upon said claim."

The witness Wells further testified that some of the contracts were signed before him, but were not executed in duplicate, and that no copy was given to the entrymen; and the witness corrected his former testimony by saying that the parties named by him filed upon the land after they first went down to see it, and that the last time they went down was in August, 1901; that there was nothing more done until the advertisement of final proof; that he had some talk with Jones and Potter in relation to the final proof, mostly with Potter; and that the only talk he had with Potter in regard to the matter was that they would be required to go to the land and make their final proof at a certain time, and that Potter gave the witness "typewritten matter in regard to the questions that would be asked," which copy is set out in the record and is a copy of the questions provided in the printed blanks of the land office in regard to testimony of such a claimant in making homestead proof.

There is much more of the testimony of the witness Wells, but enough has been stated to illustrate the point under consideration. Upon cross-examination of Wells the counsel for the plaintiffs in error got from counsel for the government the sworn statement given by Wells to the special agent for the government in relation to the matters concerning which he had testified, and asked the witness this question:

"I call your attention to this statement in what you said to Mr. Neuhausen (reading from written statement): 'According to my recollection it was about July, 1900, when Thaddeus S. Potter, who was at that time occupying an office with W. N. Jones in the Worcester Building in Portland, Or., came to me in my office at 100 Grand avenue, Portland, and stated to me that W. N. Jones had a land proposition concerning which he required to interview me.' Is that correct?"

The record proceeds:

"And the witness answered it was about correct. And the defendants' counsel, further reading from the statement as follows: 'He stated the proposition in brief to me, namely, that the aforesaid Jones proposed to advance certain money to a number of soldiers' widows who should file and prove up on homestead claims within the limits of the Siletz Indian reservation'—Mr. Potter further explained that Mr. Jones proposed to give me $5 commission for each soldiers' widow. At the conclusion of his remarks Mr. Potter stated

that Mr. Jones wished to see me in his office, and the defendants' counsel asked the witness if that was correct, and the witness answered, 'That is about correct; yes, sir.' And the defendants' counsel further reading from the said statement as follows: 'Either on the same day on which Thaddeus S. Potter interviewed me, or a day after, I called on Jones at his office in the Worcester Building, Portland, Or., and he stated the proposition to me very much the same manner as Mr. Potter had explained it to me; but he, of course, elaborated the details more carefully'—and the defendants' counsel asked the witness if that was correct, and the witness answered, 'Yes.' And thereupon the United States attorney offered the whole of said statement made to Mr. Neuhausen in evidence as a statement of the whole conversation had by the witness with Mr. Neuhausen. And in response to questions by the court the defendants' counsel stated that his purpose in reading the statement to the witness, which appears above, was to affect the credibility of the witness."

We think the statement comes within the rule of evidence, laid down in The Queen's Case, 2 Brod. & Bing. 284, 288, which case was apparently approved by the Supreme Court in C., M. & St. P. Railway v. Artery, 137 U. S. 507, 520, 11 Sup. Ct. 129, 34 L. Ed. 747, that if, on cross-examination, a witness admits a letter to be in his handwriting, he cannot be questioned by counsel as to whether statements, such as the counsel may suggest, are contained in it; but the whole letter must be read as the evidence of the existence of the statements. The declared purpose of counsel for the defendants being to show by isolated statements read by them from a previous sworn statement of the witness that he had therein made statements contradictory of his testimony on the trial, and thereby to affect his credibility, we are of the opinion that the court rightly admitted in evidence the entire statement, that the jury might correctly weigh the evidence of the witness.

We think no other point requires special notice, although we have given to the record and to the briefs of counsel careful consideration. By its charge the court fully and fairly instructed the jury as to the law governing the case and left to them the determination of the facts. This was as it should have been.

The judgment is affirmed.