UNITED STATES v. PACIFIC & A. RY. & NAV. CO. et al.

(First Division. Juneau. April 29, 1912.)

No. 835B.

CRIMINAL LAW (§ 150\*)—LIMITATION OF PROSECUTIONS—CONSPIRACY IN RESTRAINT OF TRADE—CARRIERS.

> The defendants are indicted for conspiracy in restraint of trade. The indictment shows that defendant corporation constructed a line of railroad from Skagway, Alaska, to the boundary line at the summit of White Pass, in 1898–99; that at that time there were in competitive operation, parallel to the railroad, three aerial trams and a toll wagon road, which defendants purchased, dismantled, and thereafter discontinued to date when this indictment was returned in 1912. These are the substantial facts upon which the indictment is based, and upon demurrer, on the ground that the offense is barred by the statute of limitations, *held*, the facts do not show a continuing conspiracy, but one which ended when the trams and toll road were discontinued and dismantled in 1899, and therefore the three years' statute of limitations bars the indictment. Section 1044, U. S. Rev. St. 1878, amended chapter 56, p. 98, Supp. U. S. Stat. 1874–1891 (U. S. Comp. St. 1901, p. 725).

> [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 274, 275; Dec. Dig. § 150.\*]

Count 1 of the indictment in this case charges the defendants with the crime of combining and conspiring to restrain trade and commerce by unlawfully securing control and ownership of the defendant corporation of all the transportation facilities between the northerly extremity of Lynn Canal and the headwaters of the Yukon river.

Count 2 charges an actual monopolization of all of the

---

\*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

transportation facilities by the defendant corporation between Skagway Bay, Alaska, and the navigable waters of the Yukon river.

Both counts of the indictment substantially allege that the defendant corporation, ever since its organization in 1899, operated a line of railroad from Skagway to the summit of White Pass, the boundary line between Alaska and Canada, where it connected with another line of railroad which extended from White Pass to the east shore of Lake Bennett, at which point the latter road connected with a third railroad, which extended from the east shore of Lake Bennett to White Horse, where the railroad last mentioned connected with a line of steamers on the Yukon river, plying between White Horse and Dawson, forming one continuous route from Skagway to Dawson; that during the years 1898 and 1899 there were three aerial tramways extending from Chilcott Inlet over the Chilcott Pass to Lake Lindemann, and there was a wagon road, known as the Brackett road, extending from Skagway over the White Pass summit; that the three aerial tramways and wagon road were competitors with the railroad company in the transportation of freight from Dye and Skagway to the headwaters of the Yukon river; that during the year 1898 the defendants conspired with others to purchase, and actually did purchase, for the defendant corporation the aerial tramways and the Brackett wagon road, and dismantled the tramways and discontinued the Brackett wagon road as a toll road, and continued to keep the tramways dismantled and the road discontinued until the finding of the indictment herein.

The defendants offered substantially the same objections to the indictment, and attempted to raise them in the same manner as in cause No. 836B (United States of America v. North Pacific Wharves & Trading Co., a Corporation, et al., 4 Alaska, 552).

The court will proceed to dispose of the objections as if the same were presented by demurrer in accordance with arrangements between counsel, as stated in the opinion in cause No. 836B, supra.

John Rustgard, Dist. Atty., of Juneau, for the United States.

Bogle, Graves, Merritt & Bogle and John P. Hartman, all of Seattle, Wash., and Royal A. Gunnison, of Juneau, for defendants.

LYONS, District Judge. The defendants contend that neither count of the indictment states a crime for the reason that the facts alleged do not show that the tramways or wagon road were ever actual competitors of the railroad; that the allegations of the indictment do not sufficiently show that their termini were the same as that of the defendant corporation, or that they connected with through lines of travel from their northern termini with any points on the Yukon river. The defendants further contend that, in any event, the indictment does not show any unreasonable restraint of trade and commerce or any actual monopolization or attempt to monopolize the same, for the reason that it is not alleged that the vendors of the wagon road and aerial tramways were not at liberty to again re-establish such competing concerns; nor is it alleged that anybody desiring to re-establish such competitive transportation facilities could not immediately thereafter have built aerial tramways over Chilcott Pass; nor is it alleged that an additional wagon road could not have been built paralleling the Brackett road described in the indictment; nor is it alleged that the vendors of the tramways and the wagon road were bound by contract, or otherwise, to refrain from again engaging in the transportation business in competition with the defendant corporation.

The defendants also claim that this prosecution is barred by the statute of limitations. In the view the court takes of the matter, it will be unnecessary in this opinion to consider or discuss any of the objections interposed by the defendants to the indictment, except the statute of limitations.

It is true the indictment attempts to charge a continuing conspiracy in restraint of trade and a continuing monopolization in restraint of trade and commerce, but the use of general adjectives to show a continuing conspiracy cannot carry such a conspiracy beyond the time which the specific facts

alleged warrant. It is the description of the crime by a statement of the specific facts which it is alleged constitute the crime from which the inference is drawn warranting the use of descriptive adjectives, but, if it appears from an analysis of the particulars alleged that they do not warrant the use of the descriptive adjectives applied, then the general must give way to the particular. And, if the particular facts stated in the indictment do not constitute a crime or do not constitute a continuing crime, such defects cannot be cured by such general language as an allegation to the effect that the conspiracy continued until the finding of the indictment. The facts stated in the indictment are that the railroad company procured by purchase the tramways and the wagon road in the year 1899 and dismantled the tramways and closed and discontinued the wagon road as a toll road. The only inference that can be drawn from the specific declarations in the indictment is that all of those acts were consummated in the year 1899. There is a further allegation that the tramways were continued in their dismantled condition, and the wagon road was kept closed until the finding of the indictment, and the government contends that the statute of limitations does not begin to run against the alleged crimes charged in the indictment until the tramways are rehabilitated and the roadway reopened; that there can be no end to this conspiracy until the old order of things which existed in 1899 is re-established. In other words, the conspiracy might continue long after the death of the original participants in the agreement and the defendant corporation, and its officers would be guilty of restraining trade and commerce and monopolizing the same, unless they should have, more than three years before the finding of the indictment, reconstructed the tramways and reopened the wagon road as a toll road, even though the facts on the trial might show that at this date, or during the three years preceding the finding of the indictment, the tramways and wagon road could not be considered, in any sense, competitors of the railroad.

Section 1044 of the Revised Statutes of the United States 1878 (U. S. Comp. St. 1901, p. 725) provides:

4 A.R.—37

"No person shall be prosecuted, tried, or punished for any offense, not capital, except as provided in section 1046, unless the indictment is found, or the information is instituted within three years next after such offense shall have been committed. But this act shall not have effect to authorize the prosecution, trial or punishment for any offense, barred by the provisions of existing law."

Section 1046 of the Revised Statutes of the United States 1878 (U. S. Comp. St. 1901, p. 726) provides:

"No person shall be prosecuted, tried, or punished for any crime arising under the revenue laws, or the slave trade laws of the United States, unless the indictment is found or the information is instituted within five years next after the committing of such crime."

It is conceded that three years is the time limited for the bringing of a prosecution of this character. The defendants contend that, if the indictment is sufficient to allege a crime or crimes, such crimes were committed and completed in the year 1899, and that the statute began to run immediately after the consummation of the purchase by the railroad company of the tramways and wagon road. The government contends that the crime is a continuing crime and exists at the present day, and cites, to sustain such position, the case of United States v. Kissel, 218 U. S. 604, 31 Sup. Ct. 124, 54 L. Ed. 1168. The facts alleged in the indictment in that case are substantially as follows: The defendant Kissel, acting secretly as agent of the American Sugar Refining Company, made a contract to loan to one Adolph Segal $1,250,000 on a note of Segal, secured by certain collateral, among which collateral were 26,000 shares, being a majority of the stock of the Pennsylvania Sugar Refining Company; that pursuant to such arrangement the said defendant Kissel made such loan to Segal and obtained, as collateral security from him, a majority of the stock of said Pennsylvania Sugar Refining Company, with the right to vote the same at all stockholders' meetings, and, immediately after securing such stock and the right to vote the same, he, acting as agent for the American Sugar Refining Company, elected a new board of directors and caused such board to close the plant of the Pennsylvania Sugar Refining Company, and that all that portion of the transaction was completed on January 4, 1903; but it was also alleged

in the indictment that certain resolutions were thereafter adopted by the directors of the American Sugar Refining Company, agreeing to indemnify the president and counsel for any liability in the Segal matter, and certain letters were written by one of the defendants to the secretary of the American Sugar Refining Company and the bill for disbursements rendered by the defendant Kissel to the American Sugar Refining Company, all in the year 1907. The trial court held that the offense was completed on January 4, 1903, at the time Kissel secured control of a majority of the stock of the Pennsylvania Sugar Refining Company and actually closed the plant, which occurred on January 4, 1903, and that the indictment was not filed until January 1, 1909, more than five years after the time when the alleged conspiracy was entered into and the first overt act consummated. The Supreme Court reversed the ruling of the trial court, and in doing so used the following language:

"The argument, so far as the premises are true, does not suffice to prove that a conspiracy, although it exists as soon as the agreement is made, may not continue beyond the moment of making it. It is true that the unlawful agreement satisfies the definition of the crime, but it does not exhaust it. It also is true, of course, that the mere continuance of the result of a crime does not continue the crime. United States v. Irvine, 98 U. S. 450 [25 L. Ed. 193]. But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one. Take the present case. A conspiracy to restrain or monopolize trade by improperly excluding a competitor from business contemplates that the conspirators will remain in business and will continue their combined efforts to drive the competitor out until they succeed. If they do continue such efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success."

And on page 608 of 218 U. S., on page 126 of 31 Sup. Ct., the court further said:

"It is alleged that the loan was made and that a vote was passed that the Pennsylvania Company refrain from business until further order of the board of directors. Now of course it well may be that the object was so far accomplished by this vote that the conspiracy was at an end; but a vote upon pledged stock that might be re-

deemed was not necessarily lasting, and further action might be necessary to reach the desired result. The allegation that the conspiracy continued down to the date of the indictment is not contradicted by the note. Furthermore, as we have said, the only question here is whether the plea of the statute of limitations is good."

And the court further said, beginning at page 609 of 218 U. S., at page 126 of 31 Sup. Ct.:

"Apart from technical rules, the averments of time in the indictment are expected and intended to be proved as laid. The overt acts relied upon, coming down to within three years of the indictment, are alleged to have been done in pursuance of the conspiracy, and the pleas must be taken to deny that allegation, unless they rely upon the supposed impossibility of the acts having the character alleged. It is only by an artificial rule, if at all, that the plea can be treated as not traversing the indictment, and we are not prepared to give that supposed rule such an effect."

It must be obvious, after a careful consideration of the case last cited, that it does not sustain the position assumed by the government in this case. In the Kissel Case the purpose of Kissel and his co-conspirators was to stifle competition and to crush the competitor of the American Sugar Refining Company. The first step taken pursuant to the conspiracy was to secure a majority of the stock through secret and fraudulent methods, and thereafter to elect a board of directors and close the plant. That was only the initiation of the plan for which the conspiracy was formed. The crushing process could not be completed until the competing plant should be either absorbed by the American Sugar Refining Company or else annihilated as a competitor. As is said by the Supreme Court of the United States, the purpose was to drive the competitor out of business and the conspiracy continues up to the time of the success of such a purpose or the abandonment of the same. The fact that the defendants secured a majority of the stock as collateral and closed the plant did not consummate the purposes of the conspiracy, for a vote upon pledged stock that might be redeemed was not necessarily lasting, and further action might be necessary to insure the result desired by the conspirators. In other words, the conspiracy was formed for the purpose of crushing a competitor and stifling competition, and that result cannot be consummated until the

competitor is either financially crushed or the plant is absorbed by the conspirators. It cannot be successfully contended that the acts of the defendants and their alleged co-conspirators, as portrayed by the indictment, are analogous to the acts of Kissel and his co-conspirators. In the case at bar the indictment charges that the railroad company acquired possession and ownership of the wagon road and tramways in 1899; there were no other acts necessary to be done by any of the alleged conspirators to terminate the alleged competition and eliminate the competitors. The competitors voluntarily sold, according to the indictment, to the railroad company, their alleged competitive transportation facilities. It may be true that the result of the alleged conspiracy continues long after the consummation of the same, but in this case no overt acts were necessary upon the part of the alleged conspirators to continue the alleged result of the alleged conspiracy, and the indictment fails to charge any overt acts after the purchase in 1899.

The principle announced in United States v. Irvine, 98 U. S. 450, 25 L. Ed. 193, is applicable to the case at bar. In that case it was charged in the indictment that the defendant Irvine on the 24th day of December, 1870, as the agent and attorney of Mrs. Berkley, wrongfully withheld from her the amount of her pension, to wit, $525, and continuously withheld it until the time of the finding of the indictment in September, 1875. It was contended by the government in that case that the withholding of the money by the defendant from the person entitled to it made the crime a continuing one, and for that reason the statute of limitations could not begin to run so long as the defendant held the money wrongfully; but the court said:

"It is not very easy to define, for all purposes, what constitutes, under the statute, a withholding of the pension. It cannot commence, of course, until the money is received by the party charged. Nor can it commence then, unless there is a duty of immediate payment to the pensioner. A reasonable time must certainly be allowed for this. What that is must depend in each case on its own circumstances. A refusal to pay on demand without just excuse would constitute withholding at once. Such delay as would show an intention to evade payment would constitute a withholding. If there is noth-

ing but careless delay, the party might hold the money for some time without incurring this severe penalty of two years' imprisonment. In short, there must be such unreasonable delay, some refusal to pay on demand, or some such intent to keep the money wrongfully from the pensioner, as would constitute an unlawful withholding in the meaning of the law. But, whatever this may be, which constitutes the criminal act of withholding, it is a thing which must be capable of proof to a jury, and which, when it once exists, renders the party liable to indictment. There is in this but one offense. When it is committed, the party is guilty and is subject to criminal prosecution, and from that time, also, the statute of limitations applicable to the offense begins to run. It is unreasonable to hold that 20 years after this he can be indicted for wrongfully withholding the money, and be put to prove his innocence after his receipt is lost, and when perhaps the pensioner is dead; but the fact of his receipt of the money is matter of record in the pension office. He pleads the statute of two years, a statute which was made for such a case as this; but the reply is: You received the money. You have continued to withhold it these 20 years; every year, every month, every day was a withholding, within the meaning of the statute. We do not so construe the act. Whenever the act or series of acts necessary to constitute a criminal withholding of the money have transpired, the crime is complete, and from that day the statute of limitations begins to run against the prosecution."

The alleged crime in the case at bar was completed when the railroad company became the absolute owner of the tramways and wagon road, which, according to the indictment, occurred in 1899. Our appellate court in Re Jones v. United States, 162 Fed. 417, 426, 89 C. C. A. 303, 312, used the following language:

"By some courts it has been held that inasmuch as the offense under section 5440 is the conspiracy, made effective by the commission of an overt act thereunder, the statute of limitations, which is three years, begins to run as soon as the first of such overt acts is committed, and that three years thereafter the entire offense denounced by the statute becomes barred. * * * If the conspiracy in question contemplated but the one overt act, that would undoubtedly be so. But we think it equally plain that where, as in the present case, the alleged conspiracy contemplated various overt acts, and the consequent continuance of the conspiracy beyond the commission of the first one, then each overt act gives a new, separate, and distinct effect to the conspiracy, and constitutes another crime."

The language of the appellate court just quoted is in perfect harmony with the language used by the Supreme Court in the Kissel Case, to wit, that when the conspiracy contemplates and necessitates a succession of overt acts, in order

to accomplish the purpose for which the conspiracy was formed, the statute of limitations does not begin to run until the final act necessary to secure the result for which the conspiracy was entered into; but in the case at bar there were no overt acts necessary to complete the plans contemplated by the alleged conspirators other than the purchasing of the alleged competing transportation facilities, which purpose was effected by the defendant corporation in 1899. As herebefore stated, any other view would prevent the statute of limitations from running against the alleged crime charged in the indictment until the defendants should succeed in reconstructing the aerial tramways and reopening the toll road. When the courts speak of overt acts in pursuance of a conspiracy, they mean acts necessarily done by the conspirators or their agents in furthering the plans of the conspirators. They do not mean the inaction which is charged against the defendants in not re-establishing the alleged competing transportation facilities.

It follows that the demurrer to both counts in the indictment, on the ground that they are barred by the statute of limitations, must be sustained, and the indictment dismissed; and it is so ordered.