BROWN v. ELLIOTT, UNITED STATES MAR-
SHAL IN AND FOR THE NORTHERN DIS-
TRICT OF CALIFORNIA, et al.

MOORE v. ELLIOTT, UNITED STATES MARSHAL
IN AND FOR THE NORTHERN DISTRICT OF
CALIFORNIA.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF CALIFORNIA.

Nos. 201, 202.   Argued October 19, 1911.   Reargued May 1, 1912.—De-
cided June 10, 1912.

If the indictment under § 5440, Rev. Stat., sufficiently charges the
commission of overt acts within the district, it is sufficient even
if it states that the place where the conspiracy formed is unknown.

The Sixth Amendment to the Constitution does not preclude the
place of trial of conspirators indicted under § 5440, Rev. Stat., being
in any State where an overt act was performed.  Hyde v. United
States, ante, p. 347.

A conspiracy entered into in violation of § 5440, Rev. Stat., may
be a continuous crime, and, if it was designed to be, and was, con-
tinuous, every overt act was the act of all the conspirators by reason
of the terms of their unlawful plot.

Where there are successive overt acts during the existence of the con-
spiracy, the period of limitation must be computed from the date
of the last of them properly specified in the indictment, although
some of them may have occurred more than three years before the
indictment was found.

The Constitution of the United States is not intended as a facility
for crime, but to prevent oppression; its letter and its spirit are satis-
fied if where a criminal purpose is executed that criminal purpose be
punished.  The criminal himself makes the venue of his trial.

THE facts, which involve the validity of an indictment
under § 5440 Rev. Stat., are stated in the opinion.

Mr. Henry F. Woodard and Mr. A. A. Birney for appel-
lants.

*The Solicitor General* for appellee.

MR. JUSTICE McKENNA delivered the opinion of the court.

These appeals involve the action of the Circuit Court in dismissing petitions for writs of *habeas corpus* to discharge appellants from the custody of appellee, United States Marshal for the Northern District of California. Both appellants were held under a warrant of removal made by the District Court of that district upon an order of commitment made by a United States commissioner in proceedings for the removal of appellants to the District Court of Nebraska.

There was an indictment found against appellants in the District Court of the Omaha Division of the District of Nebraska for the crime of conspiracy, in which it was charged that they and others whose names, aliases and the numbers by which they were designated as part of the means of effecting the scheme, and who in the indictment are called "conspirators," "on the fifth day of April, in the year of our Lord one thousand nine hundred and seven, did then and there" conspire with Ernest Fenby and other persons to the grand jurors unknown "to commit the acts made offenses and crimes by §.5480 of the Revised Statutes of the United States, as amended by an Act of Congress enacted March 2, 1889 (25 Stat. 873, c. 393) entitled 'An Act to punish dealers and pretended dealers in counterfeit money and other fraudulent devices for using the United States mails.'" And it is charged that appellants and the other persons conspired in devising and intending to devise a scheme and artifice to defraud various persons' out of their money and property, to be effected by means of the post-office establishment of the United States, and particularly to defraud certain persons who were named. To avoid repetition, they are called in

the indictment "victims," and they were to be defrauded of their money and property by the conspirators "agreeing to organize, institute, conduct and manage certain horse races and athletic contests . . . as wagering contests upon which money should be bet," at Council Bluffs, in Iowa, and in certain places in Missouri, Arkansas, Colorado, Louisiana and Washington, and other places to the grand jurors unknown, and "at Omaha, district aforesaid." The races and contests were to be conducted in a fraudulent, unfair and dishonest manner and to be controlled solely by the conspirators so that the outcome was known in advance, with intention thereby to defraud the victims. The charge is made with much circumstance and detail which it is not necessary to repeat except to say that the conspirators were to be represented as millionaires traveling through the United States making investments in municipal, county and city bonds, and in other projects, and having with them horses and athletes for their private amusement which they would match with those of strangers. One of the conspirators was to be represented to be the secretary to the others and as having charge of the contests which he had theretofore always managed with great financial profit and gain as well as to the amusement of his employers, but that he had become aggrieved at the treatment he had received and would so manage the contests that the horses and athletes of the millionaires would lose, and that he was desirous of betting against them and thereby win their money for himself and for such other persons as would bet for him as his secret agents. Others of the conspirators were to represent themselves to the victims to be friends and relatives of the "secretary" and had been requested by him to procure men of financial standing to act as his secret agents in betting money against his employers, the millionaires, and it was to be represented that it was necessary for him to procure such persons of financial standing and respon-

sibility to represent him and bet his money in order to conceal his disloyalty to his employers. Such persons were not to bet their own money but the secretary's money, and be paid a percentage of the winnings. The victims were to be induced to bring letters of credit or negotiable paper for large sums of money and thereby establish credit in the bank of the town where the races and contests were to be conducted. And when they, relying on the fraudulent representations of the secretary, should bet and wager money furnished by him they were to be informed that the money was not in fact his but was his employers' money; that they, the employers, had or might become suspicious that the money was not that of the victims and the secretary not the stakeholder, and to prevent criminal prosecutions the races and contests would be called off; that therefore it would be necessary for the victims to come to his (the secretary's) rescue and bet their money for him and allay such suspicions and to insure the races and contests proceeding to a finish as arranged, the money to be returned after the races and contests. And it was to be represented that the races and contests terminated unfortunately through an unusual and deplorable accident, to wit, a serious injury to one of the jockeys or one of the athletes and in such way that it would be unfair to declare themselves winners, and additional races and contests were to be conducted in the same manner and an opportunity afforded to win back the money lost. Finally it was to be represented to the victims that they had been engaged in a criminal transaction, which had resulted in a serious injury to a person, and to avoid arrest and criminal prosecution they (the victims) were to depart from the scene, and leave the money bet with the secretary, who was to convert it to the use and gain of the conspirators. And this was alleged to be fraudulent and done with intention to deceive, etc.

The manner of carrying out the scheme was alleged

to be to rent a United States post-office box for the delivery of the mail in the United States post-office at Omaha, Nebraska, and in other cities throughout the United States where any of the conspirators should establish headquarters in furtherance of the scheme and artifice to defraud, and the conspirators were to assume and request to be addressed by the number of such boxes respectively and carry on their correspondence with each other through and by means of the post-office establishment of the United States by the use of such assumed title numbers without the use of their own proper names, and to assume other names and request their victims to address them by such assumed names through and by means of the post-office establishment of the United States. And it is charged that the conspirators, in further execution of their scheme, were to take and receive letters so addressed from and out of the United States post-office at Omaha and other places which were mentioned and that they were to write and send letters to one another by means of the post-office establishment which were to contain and set forth their fraudulent and deceitful schemes and were to be shown to the other victims for the purpose of inducing the latter to turn over to the conspirators large sums of money. The conspirators, it is charged, also used the post-office establishment to open correspondence with the victims and to procure them to open correspondence with two of the conspirators, whose names are given, in pursuance of the conspiracy.

It is alleged "that the said wicked and corrupt conspiracy, combination, confederation and agreement was originally formed and entered into by the said conspirators during the year 1905, the exact date whereof is to the grand jurors unknown, in the United States of America, the exact place and district whereof is to the grand jurors unknown, and until the twenty-third day of February, in the year nineteen hundred and nine, continuously and

at all times during the four years next preceding the said twenty-third day of February," it, the conspiracy, "was continuously in existence and in the process of execution and operation and including all of said times, and the said conspirators did knowingly, falsely, wickedly and corruptly conspire, combine, confederate and agree together as aforesaid, and with said Ernest Fenby and said divers other persons to the grand jurors unknown, as aforesaid."

Overt acts are alleged, one of which is the renting by one of the conspirators under an assumed name of a postoffice box at Omaha, Nebraska, and the receiving and sending of letters to the "victims," which set forth the scheme in detail by which the "millionaires" were to be imposed on and the ease of its accomplishment and assurance of success displayed. The indictment contains copies of the letters.

The second count of the indictment alleged the conspiracy to have been formed on the first of April, 1907, and the scheme of fraud and deception was set forth in a more general way. The use of the post-office establishment was alleged, as in the first count.

The original formation of the conspiracy was alleged, as in the first count, to have been in a place and district to the grand jurors unknown, but was continuously in existence and in process of execution for four years next preceding the twenty-third of February, 1909. The overt act alleged was the depositing of a letter by one of the conspirators in the post-office at Omaha, Nebraska, which letter concerned the scheme and artifice to defraud and to effect the object of the conspiracy.

It will be observed that it is charged that appellants and those named in the indictment as "conspirators," "on April 5," 1907 (first count), "did then and there," and "on April 1," 1907 (second count), "did then and there" conspire with Ernest Fenby and others, and that races and contests upon which money was to be bet were

to be organized "at Council Bluffs, in the State of Iowa," and that the conspirators "further then and there, and at Omaha, district aforesaid," were to execute their scheme. And it is charged that the conspiracy was to be effected in the manner described and that the conspirators, further to effect the object of the conspiracy, were "to rent a United States post office box for the delivery of mail, in the United States post office at Omaha, in the State of Nebraska, district aforesaid," and in other places.

The first overt act charged in pursuance of the conspiracy on the fifth of April, 1907, is the renting of such box. To effect the object of the conspiracy formed on April 1, 1907, the first overt act is alleged to have been done in July, 1907, at Omaha.

It is, however, also alleged that the conspiracy was originally formed and entered into during the year 1905 in the United States, the exact date and place being unknown, and was continuously in existence and in the process of execution and operation during the four years preceding the twenty-third of February, 1909.

The assignments of error present the contentions that the indictment is essentially deficient in the following particulars:

1. It does not allege that the conspiracy was formed in Nebraska, but, on the contrary, alleges that it was formed at some place unknown to the grand jury.

2. It does not allege in any of its counts that the first overt acts were done in Nebraska, but that they were done in a place and district unknown.

3. The indictment shows that the conspiracies were formed more than three years prior to the finding of the indictment.

4. It does not allege that appellants consciously participated in any overt act within three years next preceding the finding of the indictment.

The first two contentions involve the jurisdiction of the

court under the Sixth Amendment of the Constitution of the United States requiring a crime to be tried in the State and district where it was committed. The third and fourth contentions raise the question of the statute of limitations.

First, as to what the indictment shows as to the formation of the conspiracy and the commission of overt acts. The appellants consider these propositions entirely upon the assumption that the only allegation that can be regarded is that which charges the formation of the conspiracy originally in 1905, and not the allegation of the formation of a conspiracy in 1907.

But nothing is specifically alleged as having been done to execute the conspiracy as originally formed. It is true, there is an allegation that the conspiracy was in existence and in the process of execution and operation, which is somewhat vague but is certainly not inconsistent with the fact that whatever was done, if anything, was done at Omaha.

It is charged that on April 5, 1907 (first count), and on April 1, 1907 (second count), the appellants and other persons "did then and there" conspire (we omit the adverbs). This might well be contended, so far as removal proceedings are concerned, as an allegation of the formation of the conspiracy in the district of Nebraska, or certainly a distinct and explicit renewal of it. And it would seem like giving technicality too much effect to consider that the agreement made in 1905, rather than its specific and formal renewal in 1907, should determine the jurisdiction of its trial. Besides, its continued existence and operation are alleged, and we have seen if overt acts were done prior to 1907 they may have been done at Omaha and constituted, with those done afterwards, a part of an entire scheme, to be executed by a succession of acts.

It is only by the assumption and insistence that the conspiracy was formed in 1905 that appellants give their

contentions any foundation whatever. If the conspiracy was formed at Omaha in 1907, upon the supposition that the conspiracy constitutes the offense and the State and district of its origin are the State and district of its trial, the District Court of Nebraska had jurisdiction. And again, upon the supposition that the first overt act completes the offense commenced by the conspiracy and by completing it determines the place of its trial, the District Court of Nebraska had jurisdiction. This follows, no matter where the overt act was done. We have pointed out, however, that the indictment does not show that the first overt act was done at a place and district unknown. The first overt act may have been performed at Omaha.

If either view, therefore, be accepted, the judgment of the Circuit Court dismissing the petitions for *habeas corpus* must be affirmed.

If, however, we assume with appellants that the indictment charges that the conspiracy was formed in 1905 and at a place unknown to the grand jurors, the same result must be pronounced, upon the authority of *Hyde* v. *The United States*, just decided, *ante*, p. 347. We there held that the place of trial could be any State and district where an overt act was performed. And we further held, following *United States* v. *Kissel*, 218 U. S. 601, that conspiracy might be a continuous crime. We there said, distinguishing a crime from its results: "But when the plot contemplates bringing to pass a continuing result that will not continue without the continuous coöperation of the conspirators to keep it up, and there is such continuous coöperation, it is a perversion of natural thought and of natural language to call such continuous coöperation a cinematographic series of distinct conspiracies, rather than to call it a single one." These remarks are especially pertinent to the case at bar. It is alleged in the indictment that the conspiracy set forth was designed to be and was continuous, and, being so, every overt act

was the act of all the conspirators, made so by the terms and force of their unlawful plot.

In *Lonabaugh* v. *United States,* 179 Fed. Rep. 476, the Circuit Court of Appeals for the Eighth Circuit considered the relation of the overt acts to the conspiracy and their effect in determining the application of the statute of limitations. The court said (p. 478), by Mr. Justice Van Devanter, then Circuit Judge: "While the gravamen of the offense is the conspiracy, the terms of section 5440 are such that there also must be an overt act to make the offense complete (*Hyde* v. *Shine,* 199 U. S. 62, 76); and so the period of limitation must be computed from the date of the overt act rather than the formation of the conspiracy. And where during the existence of the conspiracy there are successive overt acts, the period of limitation must be computed from the date of the last of them of which there is appropriate allegation and proof, and this although some of the earlier acts may have occurred more than three years before the indictment was found. *Lorenz* v. *United States,* 24 App. D. C. 337, 387; *S. C.,* 196 U. S. 640; *Ware* v. *United States,* 84 C. C. A. 503, 154 Fed. Rep. 577, 12 L. R. A. (N. S.) 1053; *S. C.,* 207 U. S. 588; *Jones* v. *United States,* 89 C. C. A. 303, 162 Fed. Rep. 417; *S. C.,* 212 U. S. 576."

If, however, the conspiracies may be regarded as distinct, then one is charged as having been formed at Omaha in April, 1907, and that overt acts were performed there to effect its object within three years of the finding of the indictment, to wit, October 7, 1909. These allegations establish the jurisdiction of the District Court of Nebraska and exclude the application of the statute of limitations.

As the place of the overt act may be the place of jurisdiction, it follows that the exact place where the conspiracy was formed need not be alleged. This case illustrates the evil which a contrary ruling would cause. The place where the conspiracy was formed was unknown

to the grand jurors (and might be so in many cases), but it was intended to be executed in a number of States of the Union, and yet, under the rigor of the contention of appellants, the conspirators could not be tried in any of them. In other words, not the place of the activities of the conspiracy and where it incurs guilt, but the place of its formation, which no one may know or can find out, is the place of the jurisdiction of its trial. And what compels this? It is answered: The Sixth Amendment of the Constitution of the United States. We have determined otherwise in *Hyde* v. *United States, ante,* p. 347.

The Constitution of the United States is not intended as a facility for crime. It is intended to prevent oppression, and its letter and its spirit are satisfied if where a criminal purpose is executed the criminal purpose be punished. It is there that its victims are sought and defrauded. It is there that its perpetrators should be brought to the bar of justice for their acts; not for the mere conception of them, but for the actual execution of them. The venue of his trial is thus made by the criminal himself, not determined by reasons or interests which may be adverse to him and used to his injury.

*Orders dismissing petitions affirmed.*

MR. JUSTICE HOLMES, dissenting.

These are appeals from orders denying writs of habeas corpus on the same state of facts, which can be set out in a few words. The petitioners were taken into custody in California for removal to Omaha, in the District of Nebraska, for trial before the District Court there, and severally petitioned for habeas corpus on the ground that the indictment showed that the Omaha court had no jurisdiction of the alleged offence. The indictment is under Rev. Stat. § 5440, amended by Act of May 17, 1879, c. 8, 21 Stat. 4, for conspiring to commit an offense

against the United States, namely, to send and receive
letters through the post-office in pursuance of a complex
scheme to defraud various people, contrary to Rev. Stat.
§ 5480, amended by act of March 2, 1889, c. 393, 25 Stat.
873.  The scheme contemplated the hiring of post-office
boxes at Omaha and other places, in six different States;
and the hiring of a box there and the posting and receiving
of letters in that place by conspirators other than the peti-
tioners are alleged as overt acts done in pursuance of the
scheme.  But it is alleged that the place where the con-
spiracy was formed is unknown, no place is laid for its
continuance, and the petitioners are not shown to have
been engaged in it in Omaha or ever to have been in the
place.  Therefore no jurisdiction is shown unless the aver-
ment of the above-mentioned overt acts makes up for all
that is left out.

To deny the jurisdiction, however, I must go farther
than was necessary in *Hyde* v. *United States,* just decided.
For in this case the offense against the United States
named as the proximate object of the conspiracy, viz.
the sending of letters through the post-office in aid of the
ultimately intended fraud, is alleged to have been accom-
plished, and indeed is laid as the overt act.  But all the
parties to the conspiracy could have been indicted in
Omaha for the use of the post-office there in pursuance of
their plan by some of their number, and it naturally may
be asked how it can be possible that the petitioners should
be collectively guilty of unlawfully using the mails in
Omaha, but not guilty of being combined there for that
purpose.

The answer has been suggested at least by what I have
said in the case of Hyde.  The parties are liable to punish-
ment where the prohibited act is done, not on the ground
of a fiction that they were present, but in spite of the fact
that they were not present.  And they well may be dealt
with there if they can be reached, for bringing about what

is deemed a harm in that place. But when they are punished for being and not for doing, when the offence consists in no act beyond the osmose of mutual understanding, they should be punished only where they are, only where the wrongful relation exists. The United States can reach them equally, it is true, in either case, but as it can try them only where the crime has been committed, the test to be applied is the same that would be applied if the crime arose under the law of one of the States. It does not follow from the defendants' liability in Omaha for certain results of their conspiracy that they can be tried there for the conspiracy itself. I assume for purposes of decision, whatever misgivings may be felt as to the justice of indicting for a conspiracy to do what actually has been done, that an indictment will lie. *Reg.* v. *Button,* 11 Q. B. 929. *United States* v. *McDonald,* 3 Dillon, 543. *United States* v. *Rindskopf,* 6 Biss. 259. *United States* v. *De Grieff,* 16 Blatchf. 20. *R.* v. *Spragg,* 2 Burr. 993. But I am of opinion that Omaha is not the proper jurisdiction in which to bring it.

If the case were decided on the narrow ground that for the purposes of removal an allegation of conspiracy 'then and there' in the middle of the indictment was to be taken to refer to the caption and the place where the indictment was found, I should say nothing. But as general principles are thought to be involved, I think it proper to state my opinion about them.

Mr. Justice Lurton, Mr. Justice Hughes and Mr. Justice Lamar concur in these views.