UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

Thomas William MAYO, Defendant-Appellant, Cross-Appellee.

Nos. 82–2431, 82–2527.

United States Court of Appeals, Seventh Circuit.

Argued April 21, 1983.

Decided Oct. 27, 1983.

As Amended Dec. 14, 1983.

Rehearing and Rehearing En Banc Denied Dec. 30, 1984.

Thomas D. Decker, Chicago, Ill., for defendant-appellant/cross-appellee.

Keith C. Syfert, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill. (Robert W. Tarun, Executive Asst. U.S. Atty., Chicago, Ill., of counsel), for plaintiff-appellee/cross-appellant.

Before POSNER and COFFEY, Circuit Judges, and NICHOLS, Senior Circuit Judge.[*]

[*] The Honorable Philip Nichols, Jr., Senior Circuit Judge of the United States Court of Appeals for the Federal Circuit, is sitting by designation.

COFFEY, Circuit Judge.

Defendant-appellant, cross-appellee, Thomas Mayo, appeals his conviction in the United States District Court, Northern District of Illinois, for conspiring to possess with intent to distribute and to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 846. The United States Government cross-appeals the trial judge's sentencing of the appellant under the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026. We affirm the conviction and remand this case to the district court for resentencing of the appellant as an adult offender under 21 U.S.C. §§ 841(a)(1), 846.

I.

The evidence at trial revealed that in early September, 1980, appellant, Thomas Mayo, while aboard one of his chartered sailboats originating in Miami, Florida, engaged in conversations with Wayne Shapley concerning the purchase and resale of cocaine. Shapley expressed an interest in purchasing cocaine in the State of Florida for resale in the State of Michigan, "because it is cheaper back in Florida than it is in Michigan." In mid to late September, 1980, Shapley returned to Muskegon, Michigan and contacted Jerry Hanson who knew people in the Muskegon area that "used" and "dealt in cocaine." Shapley and Hanson discussed Shapley's plan and Hanson agreed that if Shapley could purchase a large quantity of cocaine in Florida, the two of them could make a profit by reselling the cocaine in Michigan at higher prices. Following this discussion Shapley phoned Mayo in Miami, Florida to arrange for a cocaine purchase.

On October 20, 1980, Shapley collected $4,400.00 from Hanson and added $1,000.00 of his own money for the purchase of a "large quantity" of cocaine. The following day Shapley flew to Miami and upon arrival he phoned Mayo to confirm arrangements for the cocaine purchase. Mayo arrived at the airport within ten minutes, met Shap-

ley, drove him around Miami, and along the way, stopped at public phone booths to place phone calls in an attempt to "set up a [cocaine] deal." Mayo next proceeded to a motel where he and Shapley checked into the same room. Shortly thereafter Mayo left the motel and placed another phone call from a public phone booth across the street. Within an hour a source by the name of "Ron" arrived at the motel with eight ounces of cocaine. In the presence of Mayo and "Ron," Shapley tested the cocaine by "snorting it." "Ron" left the motel and another source by the name of "Rich" entered the room. Shapley tested "Rich's" cocaine by "snorting it" and decided to buy three ounces of cocaine from "Ron." When "Ron" returned, Shapley gave the money to Mayo who in turn gave it to "Ron." Following this transaction Mayo and "Ron" exited the room for "about an hour" to transfer the eight ounces of cocaine into a three ounce package. Upon their return, Mayo, Shapley, and "Ron" "snorted" cocaine and the three of them made arrangements for Shapley to return to Miami for another cocaine purchase following the resale of his newly acquired three ounces. According to the arrangement Mayo was to meet Shapley at the Miami airport and transport him to "Ron's" house where Shapley would purchase another quantity of cocaine for resale in the State of Michigan.

The following day, October 22, 1980, Mayo drove Shapley to the Miami airport for Shapley's return flight to Muskegon, Michigan. While enroute, Shapley informed Mayo that he would arrive at O'Hare Airport in Chicago, Illinois and from there board a commuter flight to Muskegon, Michigan. When Shapley arrived at O'Hare Airport in Chicago he was stopped by agents of the Drug Enforcement Administration ("DEA"). The agents asked Shapley for his travel bag, found 2.7 ounces of 73% pure cocaine contained therein, arrested Shapley, and processed him at the DEA airport office. Shapley signed a waiver of rights form, supplied the agents with the name of his cocaine supplier, Thomas Mayo, and agreed to place recorded phone calls to Mayo in Miami, Florida. That eve-

ning Shapley, while still in Chicago, Illinois, placed two recorded phone calls to Mayo informing Mayo that the sale of cocaine in Michigan "went over well" and that Mayo should fly to Chicago with a "six-pack." According to the code words that Mayo had supplied Shapley, a "six-pack" meant eight ounces of cocaine.

On October 25, 1980, Mayo phoned Shapley, who by this time had returned to Muskegon, Michigan, and informed him that Mayo would be arriving that day on Delta Flight 1136 at 2:40 p.m. at O'Hare Airport in Chicago with eight ounces of cocaine. Shapley relayed this information along with a physical description of Mayo to DEA agents. The agents proceeded to O'Hare Airport, positioned themselves at the appropriate terminal, "spotted" Mayo at approximately 2:40 p.m. departing from Delta Flight 1136, and followed him down the concourse. At approximately 3:30 p.m. the agents approached Mayo, identified themselves, and with Mayo's consent conducted a search which uncovered no cocaine. At approximately 6:10 p.m. that evening, DEA agents, based upon the information obtained from Shapley and the recorded phone conversations between Mayo and Shapley, arrested Mayo in the Hyatt Regency Hotel, across from O'Hare Airport, for conspiracy to violate the narcotics laws. Mayo voluntarily signed a waiver of rights form, and told police that he had sold "approximately four ounces of cocaine" to Shapley "a few days earlier." Mayo also stated that he had flown to Chicago in an attempt to persuade Shapley to come to Florida for another cocaine purchase.

On December 23, 1981, a Federal Grand Jury returned an indictment against Mayo charging him with conspiracy to supply Wayne Shapley with cocaine in the State of Florida for resale in the State of Michigan, between the months of July, 1980 and October, 1980, in violation of 21 U.S.C. §§ 841(a)(1), 846. On March 18, 1982, Mayo pleaded not guilty to this charge. On July 9, 1982, following a three-day bench trial, the trial judge found Mayo guilty as charged. On August 18, 1982, the trial

judge entered judgment on the finding of guilt and sentenced Mayo to a term of three years incarceration, suspended all but thirty days of the imprisonment, and imposed a four-year probationary period to follow the one month period of confinement.

On August 18, 1982, Mayo filed a motion with the district court requesting imposition of the sentence under the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026, as extended in 18 U.S.C. § 4216. Sentencing Mayo under this Act would allow the court, pursuant to 18 U.S.C. § 5010(a), to suspend Mayo's entire sentence and place him on probation. The Government claimed that Mayo failed to qualify for sentencing under the Federal Youth Corrections Act because he reached the age of twenty-six years on April 14, 1982, some four months before the date of his conviction. 18 U.S.C. § 4216 mandates that an offender be under twenty-six years of age at the time of conviction in order to qualify for sentencing under the Federal Youth Corrections Act. The trial judge, in spite of this express age limitation contained in the statute, granted Mayo's motion and sentenced him under the Federal Youth Corrections Act, 18 U.S.C. § 5010(a), on August 19, 1982. The trial judge reasoned that Mayo should not be compelled to waive his right to a trial just to qualify for sentencing under the Federal Youth Corrections Act and that Mayo had no control over the Government's delay in bringing this case to trial.

On appeal, Mayo contends:

A. That the evidence presented at trial was insufficient to establish, beyond a reasonable doubt, that Mayo violated 21 U.S.C. §§ 841(a)(1), 846.

B. That venue in the Northern District of Illinois was improper for purposes of 21 U.S.C. § 846.

On cross-appeal, the Government contends:

C. That the trial judge exceeded his authority by sentencing Mayo under the Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026.

We shall consider these issues individually.

## II.

### A. SUFFICIENT EVIDENCE OF CONSPIRACY

■ Appellant Mayo contends that the Government's portrayal of the events which occurred during the months of September and October, 1980, as constituting an ongoing conspiracy between Mayo and Shapley, is inaccurate. Instead, appellant fabricates a novel and unique theory, referring to these events as three separate and distinct episodes. As appellant would have us believe, episode one consisted of a buyer-seller relationship between Mayo and Shapley beginning in September, 1980 and continuing through the October 21, 1980 sale of cocaine to Shapley. Episode two was comprised of tentative plans about future cocaine dealings between Mayo, Shapley, and "Ron," discussed in a Miami, Florida motel room immediately following the October 21, 1980 sale of cocaine. Episode three, on the other hand, consisted of Shapley's conversations with Mayo, concerning the purchase of additional cocaine in the State of Florida for resale in the State of Michigan, following Shapley's agreement to cooperate with the Government. Despite appellant's novel attempt to delineate the events which transpired during September and October, 1980, as being separate and distinct from each other, we hold that these episodes merge into one ongoing conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846.

■ This court has, on numerous occasions, had the opportunity to review convictions for violation of 21 U.S.C. §§ 841(a)(1), 846. As we have previously stated, and again reiterate, when reviewing the sufficiency of evidence to establish a conspiracy to possess with intent to distribute narcotics, we will affirm the trial court unless the evidence, viewed in the light most favorable to the Government, could not have persuaded any rational trier of fact of defendant's guilt beyond a reasonable doubt. *United States v. Fleming,* 677 F.2d 602, 609 (7th Cir.1982); *United States v. Garza-Her-*

*nandez,* 623 F.2d 496, 501 (7th Cir.1980); *United States v. Washington,* 586 F.2d 1147, 1152 (7th Cir.1978); *United States v. Page,* 580 F.2d 916, 919 (7th Cir.1978); *United States v. Garcia,* 562 F.2d 411, 414 (7th Cir.1977).

We begin our analysis of the events which occurred in September and October, 1980, with the basic tenet that "a conspiracy consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Hedman,* 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). *Accord United States v. Dalzotto,* 603 F.2d 642, 644 (7th Cir.), *cert. denied sub nom. Young v. United States,* 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979); *United States v. Mancillas,* 580 F.2d 1301, 1307 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). To this we add that, "[b]y its nature conspiracy is conceived and carried out clandestinely, and direct evidence of the crime is rarely available. Thus, circumstantial evidence from which the jury could reasonably infer the existence of an agreement is permissible." *United States v. Washington,* 586 F.2d at 1153 (citing *United States v. Santos,* 385 F.2d 43, 44 (7th Cir.1967)); *Accord United States v. Page,* 580 F.2d at 920.

Our review of the evidence reveals that in September, 1980, Shapley inquired of Mayo, "if I got the money together . . . could [you] score me or get me some cocaine and in an ounce quantity because it is cheaper in Florida than it is in Michigan."

To this Mayo responded that, "he would look into it, and . . . would keep in touch." Contrary to appellant's single and separate episode theory, the relationship between Mayo and Shapley was, at this time, one of concerted actors.[1] Shapley sought not only to purchase cocaine for a low price in the State of Florida, but to transport it to the State of Michigan for resale at a profit. In furtherance of this plan, Mayo agreed to seek out, arrange for, and establish cocaine "contacts" for Shapley in the State of Florida.

Mayo's participation in this concerted activity to "buy low, sell high" is evidenced by his meeting Shapley at the airport, driving him to the motel, arranging to introduce him to sources named "Ron" and "Rich," vouching for the reliability of these sources, accepting Shapley's payment for three ounces of cocaine and giving it to "Ron," and leaving with "Ron" to repackage the cocaine. Further evidence of Mayo's participation is found in the conversation following the cocaine purchase on October 21, 1980. At that time Mayo, Shapley, and "Ron" made "arrangements" for another cocaine transaction the following week with Shapley flying from Muskegon, Michigan to Miami, Florida, meeting Mayo, staying at "Ron's" house and purchasing another quantity of cocaine.[2] Still further evidence of Mayo's participation is found in Mayo's conveying Shapley to the Miami airport on October 22, 1980, so that Shapley could return to Michigan, supplying Shapley with and instructing him to use a list of code words whenever discussing cocaine dealings over the telephone, and arranging to re-

---

1. Appellant contends that during these conversations in September, 1980, Shapley wanted to purchase a quantity of cocaine for his own use, thus, his relationship with Mayo was one of a buyer and seller. Appellant relies upon *United States v. Ford,* 324 F.2d 950, 952 (7th Cir.1963) to argue that because Mayo and Shapley were simply in a buyer and seller relationship, no conspiracy was formed. The evidence, however, reveals that Mayo knew of Shapley's intention to resell cocaine in the State of Michigan following the conversations in September, 1980. Furthermore, after returning to Michigan Shapley spoke with Jerry Hanson about getting a "large quantity" of cocaine so that he

could resell it and make a profit. Shapley then relayed this information to Mayo in Miami, Florida.

2. Appellant claims that, at best, these plans were tentative and because the whole arrangement depended upon Shapley's successful resale of the three ounces of cocaine in Michigan, Mayo and Shapley never "agreed" to future cocaine purchases. On cross-examination, however, Shapley testified that "future items would just involve Tom [Mayo] and Ron . . . we made definite arrangements."

main in contact with Shapley once he returned to Michigan.

We hold that based upon the totality of the evidence presented, a rational trier of fact could very reasonably and logically find beyond a reasonable doubt that Mayo participated with Wayne Shapley in a conspiracy to purchase cocaine in the State of Florida for resale in the State of Michigan. *See, e.g., United States v. Mancillas,* 580 F.2d at 1307. Thus, the evidence is sufficient to establish that Mayo conspired to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846.

## B. VENUE UNDER 21 U.S.C. § 846[3]

■ Appellant next contends that if a conspiracy does exist, venue in the Northern District of Illinois is improper because no agreement between Mayo and Shapley ever occurred in that district. Appellant premises this argument upon *United States v. Umentum,* 547 F.2d 987, 991 (7th Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977), where this court held that to establish a conspiracy in violation of 21 U.S.C. § 846 the Government need only prove an agreement and need not allege or prove an overt act. This differs from general conspiracy law where an agreement and an overt act in furtherance of the agreement must be proved to establish a conspiracy. *See, e.g.,* 18 U.S.C. § 371. Appellant asserts that because 21 U.S.C. § 846 requires no allegation or proof of an overt act, in furtherance of the agreement, venue under 21 U.S.C. § 846 is limited to any district where the agreement occurred as contrasted to the general conspiracy law principle which allows for venue in any district where the agreement occurred or any district where an overt act, in furtherance of the agreement, occurred. *See, e.g., Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912). Appellant claims that if, in fact, an agreement

was consummated between Mayo and Shapley that agreement occurred in Miami, Florida, thus venue properly lies in the Southern District of Florida rather than the Northern District of Illinois. Appellant further contends that by allowing this case to remain in the Northern District of Illinois, the district court violated Fed.R. Crim.P. 18 and appellant's Sixth Amendment right to a trial in the district where the crime was committed.

The fact that no overt act need be alleged or proved for conviction under 21 U.S.C. § 846, *United States v. Umentum,* 547 F.2d at 991. *Accord United States v. Cortwright,* 528 F.2d 168, 172 n. 1 (7th Cir.1975); *United States v. Garfoli,* 324 F.2d 909, 910–11 (7th Cir.1963), does not affect the place of venue for purposes of 21 U.S.C. § 846.

■ A review of recent case law reveals that the United States Courts of Appeals for the Fifth, Eighth, and Ninth Circuits have held that venue under 21 U.S.C. § 846 is proper in the district where an overt act, in furtherance of the conspiracy, occurs. *See United States v. Diaz,* 685 F.2d 252, 255 (8th Cir.1982); *United States v. Nicoll,* 664 F.2d 1308, 1311 (5th Cir.), *cert. denied,* 457 U.S. 1118, 102 S.Ct. 2929, 73 L.Ed.2d 1330 (1982); *United States v. DeLeon,* 641 F.2d 330, 336 (5th Cir.1981); *United States v. Schoor,* 597 F.2d 1303, 1308 (9th Cir.1979); *United States v. Strickland,* 493 F.2d 182, 187 (5th Cir.1974), *cert. dismissed,* 419 U.S. 801, 95 S.Ct. 9, 42 L.Ed.2d 32 (1975). In addition, we refer to *United States v. Cooper,* 606 F.2d 96, 97 (5th Cir.1979), *cert. denied,* 444 U.S. 1024, 100 S.Ct. 685, 62 L.Ed.2d 657 (1980) where the United States Court of Appeals for the Fifth Circuit, considering the constitutionality of 21 U.S.C. § 846, stated:

"In permitting the Government to bring conspiracy charges in any district where an overt act was alleged to have been committed, the statute [21 U.S.C. § 846] is not inconsistent with the Sixth Amend-

---

**3.** 21 U.S.C. § 846 provides:
   "Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or

both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

ment right of the accused to 'trial, by an impartial jury of the state and district wherein the crime shall have been committed.' "

In line with this authority and based upon our reading of the United States Supreme Court's language in *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912) we hold that venue under 21 U.S.C. § 846 is proper in any district where an overt act, in furtherance of the conspiracy, occurs.[4]

In *Hyde,* the Court was considering whether venue in a conspiracy case under § 5440 Rev.Stat. (1901) properly lies in the state or district where the conspiracy was entered into or any state or district where an overt act, in furtherance of the conspiracy, was performed.[5] The statute required that for conviction the Government had to prove that two parties conspired to commit an offense against the United States and that at least one of the parties had performed an overt act in furtherance of the conspiracy. In its well-reasoned analysis, the Court stated "that a conspiracy is not necessarily the conception and purpose of the moment, but may be continuing." 225

U.S. at 363, 32 S.Ct. at 800. Additionally, "[t]he law considers that wherever [conspirators] act there they renew, or perhaps, to speak more properly they continue, their agreement, and this agreement is renewed or continued as to all whenever any one of them does an act in furtherance of their common design." 225 U.S. at 365, 32 S.Ct. at 801 (quoting *Robinson v. United States,* 172 F. 105 (8th Cir.1909)). *Accord United States v. Kissell,* 218 U.S. 601, 608, 31 S.Ct. 124, 126, 54 L.Ed. 1168 (1910); *United States v. Read,* 658 F.2d 1225, 1234 (7th Cir.1981). The Court went on to hold that venue was proper in any state or district where an overt act, in furtherance of the conspiracy, occurs. Though the Court in *Hyde* was analyzing a statute which required allegation and proof of an overt act, and thereby differed from 21 U.S.C. § 846, the characterization of a conspiracy as "continuing" lends credence to the ongoing nature of conspiracy.[6]

■ Applying the Supreme Court's conspiracy analysis to the facts before us, the agreement between Mayo and Shapley, to

---

**4.** Our holding finds further support at common law where courts held venue in a conspiracy case to be proper in the district where an overt act, in furtherance of the conspiracy, occurred even though the law at the time did not require allegation or proof of an overt act to establish a conspiracy. In *Hyde* the Court stated, "It is true that the conspiracy, the unlawful combination, has been said to be the crime, and that *at common law it was not necessary to aver or prove an overt act....*" (emphasis added). 225 U.S. at 359, 32 S.Ct. at 799. The Court then referred to the common law principle that, "[a]t common law the venue in conspiracy could be laid in any county in which it could be proven that an overt act was done by any one of the conspirators in furtherance of their common design." 225 U.S. at 365, 32 S.Ct. at 801 (quoting 1 Archbold's Criminal Practice and Pleading 226 (8th ed.)).

**5.** Section 5440 Rev.Stat. (1901) provided:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not

more than ten thousand dollars, or to imprisonment for not more than two years, or to both fine and imprisonment in the discretion of the court."

**6.** We note the language of the United States Supreme Court in *Nash v. United States,* 229 U.S. 373, 378, 33 S.Ct. 780, 782, 57 L.Ed. 1232 (1913) that:

"The decisions as to the relations of a subsequent overt act to crimes under Rev.Stat. § 5440 in *Hyde v. United States,* 225 U.S. 347 [32 S.Ct. 793, 56 L.Ed. 1114], and *Brown v. Elliott,* 225 U.S. 392 [32 S.Ct. 812, 56 L.Ed. 1136], have no bearing upon a statute that does not contain the requirement found in that section."

In *Nash,* however, appellant argued that the Government had failed to allege an overt act in a charge of conspiracy to violate the Sherman Act. The Supreme Court merely addressed the issue of whether overt acts had to be alleged for a conspiracy to violate the Sherman Act. The Court determined that no overt act need be alleged. Based upon these facts, we do not believe that the above language precludes us from relying upon *Hyde* for an insight into the nature of conspiracy for purposes of determining where venue properly lies under 21 U.S.C. § 846.

purchase cocaine in the State of Florida for resale in the State of Michigan, occurred at the time Mayo and Shapley initially entered into discussions in September of 1980 and also at the time any overt act was committed in furtherance of the conspiracy. Thus, the overt act committed in the Northern District of Illinois, namely Shapley's arrival at O'Hare Airport in Chicago, Illinois, while enroute to Muskegon, Michigan with 2.3 ounces of cocaine purchased in a transaction with Mayo and "Ron," was merely a continuance of the conspiracy which Mayo and Shapley entered into in the State of Florida. This overt act was just another brick in the pyramid we call a conspiracy. Accordingly, venue was proper, for purposes of 21 U.S.C. § 846, in the Northern District of Illinois.

We recognize, as did the Supreme Court in *Hyde,* that our holding provides the Government with a power which may be abused. We also realize that substantial countervailing considerations exist which justify our conclusion that venue is proper in any district where an overt act, in furtherance of the conspiracy, is committed. As the Court so aptly stated:

> "We realize the strength of the apprehension that to extend the jurisdiction of conspiracy by overt acts may give to the Government a power which may be abused, and we do not wish to put out of view such possibility. But there are counter considerations. It is not an oppression in the law to accept the place where an unlawful purpose is attempted to be executed as the place of its punishment, and rather conspirators be taken from their homes than the victims and witnesses of the conspiracy be taken from theirs. We must not, in too great a solicitude for the criminal, give him a kind of immunity from punishment because of the difficulty in convicting him—indeed, of even detecting him. And this may result, if the rule contended for be adopted. Let him meet with his fellows in

secret and he will try to do so; let the place be concealed, as it can be, and he and they may execute their crime in every State in the Union and defeat punishment in all. And the suppositions are not fanciful, as illustrated by a case submitted coincidently with this. *Brown v. Elliott, post* [225 U.S.] p. 392 [32 S.Ct. p. 812, 56 L.Ed. p. 1136]. The possibility of such a result repels the contention and demonstrates that to yield to it would carry technical rules and rigidity of reasoning too far for the practical administration of criminal justice. We see no reason why a constructive presence should not be assigned to conspirators as well as to other criminals . . . ."

*Hyde,* 225 U.S. at 363–64, 32 S.Ct. at 800–01. As noted by the Court, to hold otherwise, i.e., to require that venue only be in the district where the agreement occurred, would allow conspirators to execute their crime in every state of the Union and, if the place of agreement were concealed, to escape prosecution. *See Brown v. Elliott,* 225 U.S. 392, 401–02, 32 S.Ct. 812, 815–16, 56 L.Ed. 1136 (1911). Thus, our decision promotes the practical administration of criminal justice in conspiracy cases under 21 U.S.C. § 846 without violating either Fed. R.Crim.P. 18 or the Sixth Amendment since in our view, each time conspirators commit an overt act in furtherance of the conspiracy, they renew or continue their conspiratorial agreement. *Accord Hyde,* 225 U.S. at 365, 32 S.Ct. at 801.

## C.  SENTENCING UNDER THE FEDERAL YOUTH CORRECTIONS ACT

The Government, cross-appellant, contends that the sentencing of Mayo under the Federal Youth Corrections Act, specifically 18 U.S.C. § 5010(a), was improper.[7] The Government's position is that 18 U.S.C. § 4216 expressly provides that to fall within the Federal Youth Corrections Act, the

---

**7.** 18 U.S.C. § 5010(a), provides:
  "If the court is of the opinion that the youth offender does not need commitment, it

may suspend the imposition or execution of sentence and place the youth offender on probation."

defendant must be under the age of twenty-six years at the time of conviction.[8] Because Mayo turned twenty-six on April 14, 1982 and he was convicted, as that term is defined in 18 U.S.C. § 5006(g), on August 18, 1982, Mayo falls outside the ambit of the statute. The trial judge, however, explained that he sentenced Mayo under the Federal Youth Corrections Act because "a defendant should not be compelled, in order to have the advantages of the Youth Corrections Act, to waive any claims he may make, constitutional claims" and "there was almost a year's delay between the dismissal of the magistrate's complaint on the Government's motion and the filing of the indictment." [9]

█ We approach appellant's contention from the well-established principle that the sentence imposed by a trial judge, within the applicable statutory limit, is only subject to review on appeal for an abuse of discretion. *See United States v. Madison,* 689 F.2d 1300, 1312 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983); *United States v. Fleming,* 671 F.2d 1002, 1003 (7th Cir.1982); *United States v. Main,* 598 F.2d 1086, 1094 (7th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 301, 62 L.Ed.2d 311 (1979). We add, however, that when interpreting a statute, we must first look to the language of the statute itself. *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978); *Mills v. United States,* 713 F.2d 1249 at 1251 (7th Cir.1983).

The Federal Youth Corrections Act, 18 U.S.C. §§ 5005–5026 as extended in 18 U.S.C. § 4216, provides in pertinent part:

18 U.S.C. § 5006,

\* \* \* \* \* \*

"(d) 'youth offender' means a person under the age of twenty-two years at the time of conviction;

\* \* \* \* \* \*

(g) 'Conviction' means the judgment on a verdict or finding of guilty, a plea of guilty, or a plea of *nolo contendere.*"

18 U.S.C. § 4216,

"In the case of a defendant who has attained his twenty-second birthday *but has not attained his twenty-sixth birthday at the time of conviction,* if, after taking into consideration the previous record of the defendant as to delinquency or criminal experience, his social background, capabilities, mental and physical health, and such other factors as may be considered pertinent, the court finds that there are reasonable grounds to believe that the defendant will benefit from the treatment provided under the Federal Youth Corrections Act (18 U.S.C., chap. 402) sentence may be imposed pursuant to the provisions of such Act." (emphasis added).

█ The language of these statutes clearly provides that an offender must be under the age of twenty-six years at the time of conviction to be sentenced under the Federal Youth Corrections Act. The statutes confer no authority upon the federal courts to make exceptions to this expressed rule of law. Accordingly, because

---

**8.** Conviction is defined as the judgment on a verdict or finding of guilty, a plea of guilty, or a plea of *nolo contendere.* 18 U.S.C. § 5006(g).

**9.** The appellant contends, in a post-oral argument motion, that this court was without jurisdiction to review the district court's sentencing of Mayo under the Federal Youth Corrections Act. In this instance, however, the district court's determination that Mayo qualified for sentencing under the Act constituted a final decision, independent from Mayo's conviction under 21 U.S.C. §§ 841(a)(1), 846, *see Carroll v. United States,* 354 U.S. 394, 403, 77 S.Ct. 1332, 1338, 1 L.Ed.2d 1442 (1957), and thus,

this court's review of that decision will not place defendant Mayo in double jeopardy for the same crime. Accordingly, pursuant to 28 U.S.C. § 1291, this court has jurisdiction to review the district court's erroneous, independent determination that Mayo did qualify for sentencing under the Federal Youth Corrections Act. *See United States v. Prescon Corp.,* 695 F.2d 1236, 1241–42 (10th Cir.1982); *United States v. DeMier,* 671 F.2d 1200, 1203–04 (8th Cir.1982); *United States v. United States District Court, Central District of California,* 601 F.2d 379, 380 (9th Cir.1978); *United States v. Busic,* 592 F.2d 13, 25–26 (2nd Cir.1978).

appellant reached the age of twenty-six years some four months before his conviction, he fails to fall within the express confines of the statute and thereby does not qualify for sentencing under the Federal Youth Corrections Act.

Though judicial inquiry is ordinarily at an end when the language of a statute is unambiguous, *United States v. Agrillo-Ladlad,* 675 F.2d 905, 908 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982) (citing *Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 108 (1980)), due to the liberal interpretation of 18 U.S.C. § 4216 in *United States v. Rivera,* 427 F.Supp. 89 (S.D.N.Y. 1977) and *United States v. Villar,* 416 F.Supp. 887 (S.D.N.Y.1976) we believe it necessary to further support our decision by reviewing recent case law and the legislative history of the Federal Youth Corrections Act, as extended in 18 U.S.C. § 4216.

Turning initially to recent case law, in *United States v. Barton,* 566 F.2d 1106, 1107 (9th Cir.1977) the United States Court of Appeals for the Ninth Circuit stated: "The statute [Federal Youth Corrections Act] is specifically limited to 'a defendant who has attained his twenty-second birthday but has not attained his twenty-sixth birthday at the time of conviction.' "

*See also United States v. Boydston,* 622 F.2d 398, 399 (8th Cir.1980). Similarly the Fifth Circuit Court of Appeals in *United States v. Riffe,* 600 F.2d 1146, 1147 (5th Cir.1979) stated that "the Federal Youth Corrections Act, as extended, applies only to those who are age 22 to 25 at the time of conviction." In holding to the literalness of the statute, these courts realize that "although the term 'conviction' has been liberally construed to include not only the time of judgment, but also a return of a guilty verdict or entry of a plea of guilty ... the term is not sufficiently elastic to encompass other steps in the trial proceeding antedating some kind of guilt determination." [10] *United States v. Boydston,* 622 F.2d at 399; *United States v. Barton,* 566 F.2d at 1107. *See also United States v. Branic,* 495 F.2d 1066 (D.C.Cir.1974).

Furthermore, in 1950, when Congress passed the original Federal Youth Corrections Act, the House Report provided:

"The proposed legislation is designed to make available for the discretionary use of the Federal judges a system for the sentencing and treatment of persons under the age of 22 years who have been convicted of crime in the United States courts that will promote the rehabilitation of those who in the opinion of the sentencing judge show promise of becoming useful citizens, and so will avoid the degenerative and needless transformation of many of these young persons into habitual criminals."

H.R.Rep. No. 2979, 81st Cong., 2nd Sess. 1 *reprinted in* 1950 U.S.Code Cong. & Adm. News 3983. In 1958 Congress extended the Federal Youth Corrections Act by enacting 18 U.S.C. § 4209, to include defendants from ages twenty-two to twenty-six. The House Report revealed that this new sec-

---

**10.** We refuse to extend the definition of "conviction" beyond a plea of guilty as did the district court in the Southern District of New York in *United States v. Rivera,* 427 F.Supp. 89 (S.D.N.Y.1977) and *United States v. Villar,* 416 F.Supp. 887 (S.D.N.Y.1976).

We distinguish the holding in *Villar* because in that case the court, concerned that the defendant was denied the effective assistance of counsel, exercised its power to fashion an appropriate remedy for the deprivation of that right. No such concern exists in this instance.

We admittedly have a more difficult time distinguishing *Rivera* as the facts in that case appear to be very near on point to those in this instance. We do, however, disagree with the court's statement that to hold that the Act

cannot apply to a defendant who turned twenty-six, because he chose to adjudicate his constitutional right, would obviously discourage such a person from pursuing these rights. We reason that such a person can still pursue these rights with the realization that he must accept the consequences of his decision outside the benefit of the Federal Youth Corrections Act. The Constitution provides no right to be sentenced under the Federal Youth Corrections Act, rather, the Act is intended by Congress as a "corrective and preventative guidance" provision to be applied at the trial judge's discretion. *See, e.g., Dorszynski v. United States,* 418 U.S. 424, 433–34, 94 S.Ct. 3042, 3048, 41 L.Ed.2d 855 (1974).

tion applied to those "offenders who have attained their 22nd birthday and are under the age of 26 at the time of conviction." H.R.Rep. No. 1946, 89th Cong., 2d Sess. 3–4; *see also* S.Rep. No. 2013, 89th Cong., 2d Sess. 2 *reprinted in* 1958 U.S.Code Cong. & Adm.News 3891, 3892. At that time, the term conviction was defined in 18 U.S.C. § 5006(h) as the judgment on a verdict or finding of guilty, a plea of guilty, or a plea of *nolo contendere*. From this language, which is presently embodied in 21 U.S.C. § 4216, it is clear that Congress intended the Federal Youth Corrections Act to apply only to those offenders who had not reached the age of twenty-six years at the time of conviction. *See, e.g., Dorszynski v. United States,* 418 U.S. 424, 433 n. 9, 94 S.Ct. 3042, 3048 n. 9, 41 L.Ed.2d 855 (1974).

In light of the express language of 18 U.S.C. § 5006(g) and § 4216, the judicial interpretation of 18 U.S.C. § 4216, and the Congressional intent in enacting the Federal Youth Corrections Act, as extended in 18 U.S.C. 4216, we hold that to qualify for sentencing under the Federal Youth Corrections Act, the offender must be under the age of twenty-six years at the time of conviction, as that term is defined in 18 U.S.C. § 5006(g). Because Mayo reached the age of twenty-six on April 14, 1982, some four months before his conviction on August 18, 1982, the sentencing of Mayo under the Federal Youth Corrections Act constitutes an abuse of discretion.

### III.

We affirm the judgment of conviction and remand this case to the district court for resentencing of the appellant under 18 U.S.C. §§ 841(a)(1), 846 as an adult offender.